UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
JOEL ALVARADO, On behalf of themselves and
others similarly situated,

               Plaintiff,

       -against-

GC DEALER SERVICES INC., JENNIFER AYALA,
ANTHONY AYALA and JACK BECKERMAN, In
their individual capacities,

              Defendants.
---------------------------------------------------------------X

**ORDER**
18-CV-2915(SJF)(SIL)

**FILED**
**CLERK**

4:43 pm, Jan 06, 2021

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

FEUERSTEIN, District Judge:

## I.     Introduction

On or about May 16, 2018, plaintiff Joel Alvarado ("Alvarado") commenced this collective action against defendants GC Dealer Services Inc. ("GC"), Jennifer Ayala, Anthony Ayala and Jack Beckerman ("Beckerman") (collectively, "defendants"), alleging, *inter alia*, violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, and the New York State Labor Law ("NYLL"). Subsequently, opt-in plaintiffs Fabio Rodolfo Chagon ("Chagon"), Emiliano Flores ("Flores") and Heriberto Ramirez Ortiz ("Ramirez") (collectively, and together with Alvarado, "plaintiffs"), each filed a Consent to Joinder to become a party plaintiff in this action. Pending before the Court are the parties' cross motions for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, the cross motions are granted in part and denied in part.

1

II.   Background

A.   Factual Allegations[1].

GC, which was incorporated in 2016, does auto cleaning for dealerships. (Plf. 56.1, ¶¶ 2,

4, 23)[2]. Jennifer Ayala is the President of GC and, in that capacity, she filed the corporate tax

returns for the company. (*Id.*, ¶¶ 1, 6). Jennifer Ayala is the only signatory on GC's business

account and only she can dissolve the company. (*Id.*, ¶¶ 5, 8). Jennifer Ayala's responsibilities as

President of GC include, but are not limited to, signing business checks, making deposits to GC's

commercial account, and paying Beckerman, (*id.*, ¶¶ 7, 24), who was employed by GC as a

supervisor since July 8, 2016. (*Id.*, ¶¶ 19-20). Jennifer Ayala hired Beckerman to run the day-to-

day activities of the business; would provide Beckerman with the funds to pay the employees at

GC; would be responsible for depositing payments received from the three dealerships (3) for

---

[1] The factual allegations are taken from the materials in the record that would be admissible in evidence, *see*, Fed. R. Civ. P. 56(c)(1), and the parties' statements and counterstatements pursuant to Local Civil Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Civil Rule 56.1"), to the extent that they are properly supported pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. *See* Local Civil Rule 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."); *New World Sols., Inc. v. NameMedia Inc.*, 150 F. Supp. 3d 287, 305 (S.D.N.Y. 2015) ("[I]f a party fails to properly support a statement by an adequate citation to the record, the Court may properly disregard that assertion."); *F.D.I.C. v. Hodge*, 50 F. Supp. 3d 327, 343, n. 2 (E.D.N.Y. 2014) ("Statements without citation to evidence may be properly ignored by the court."); *Kaur v. New York City Health & Hosps. Corp.*, 688 F. Supp. 2d 317, 322 (S.D.N.Y. 2010) ("Where there are no citations or where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion.") Moreover, only those facts that are material to the disposition of the motion, *i.e.*, that "might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), are set forth herein. *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) ("The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" (brackets in original) (quoting *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505)). The facts are undisputed unless otherwise indicated.

[2] Where the facts are undisputed, the parties' respective Statements of Material Facts pursuant to Local Civil Rule 56.1 are collectively cited as "Plf. 56.1" and "Def. 56.1," respectively.

which GC cleaned cars; and maintained the payroll records of GC, which she kept in her basement. (*Id.*, ¶¶ 11-14, 23).

Beckerman interviewed for the position at GC with Jennifer Ayala and Anthony Ayala. (Plf. 56.1, ¶ 21). Beckerman testified that in 2016, Jennifer Ayala told him that there was an opportunity at Nissan of Garden City, so he went and met with a member of that dealership, Philip Delzatto ("Delzatto"). (Declaration of Delvis Melendez in Support of Plaintiffs' Motion for Summary Judgment ["Melendez SJ Decl."], Ex. E at 24:17-25). According to Beckerman, he told Delzatto that Jennifer Ayala had sent him, (*id.* at 25:2-5), but he agreed to the terms of GC's agreement with that dealership and he did not have to get authorization from Jennifer Ayala to agree to those terms. (*Id.* at 25:14-19).

Beckerman's responsibilities at GC included hiring, firing, and basically running the business. (Plf. 56.1, ¶ 22). Specifically, Beckerman interviewed, hired and fired the employees for GC, including plaintiffs; set the pay rates and work schedules for the employees; paid the employees both in cash and by check; and manually inputted the information sent to ADP for payroll. (*Id.*, ¶¶ 25-35). Most employees at GC were paid in cash; Beckerman paid Ramirez in cash, except for one (1) week in which he placed him on payroll; and Beckerman paid Chagon and Flores in cash off the books. (*Id.*, ¶¶ 37-39, 48). Beckerman paid the employees in cash at their request; did not take out withholding tax; and did not know that he was required to take withholding taxes from employees' salaries. (*Id.*, ¶¶ 40-41, 47). Jennifer Ayala gave Beckerman the cash to pay the employees, but Beckerman determined how much cash was to be given to each employee. (*Id.*, ¶¶ 42-43). Beckerman did not have any cash receipts or any records signed by plaintiffs with respect to the cash they received. (Declaration of Delvis Melendez in

Opposition to Defendants' Motion for Summary Judgment ["Melendez Opp."], Ex. A at 124:2-11).

According to Beckerman, he was the only person who kept track of the hours worked by GC's employees. (Melendez Opp., Ex. A at 36:7-12, 38:14-9, 41:7-8, 66:15-22). With respect to employees' pay rates, Beckerman testified, in pertinent part:

> Q.     And how did you calculate the amount that was due to each employee?
>
> A.     The base pay would be the hourly minimum wage up to the 40 hours. Anything above the 40 hours equaled one and a half times the pay, the overtime.
>
> Q.     Did you ever have an agreement where you would pay employees per day?
>
> A.     Not that I recall.
>
> Q.     Did you ever have an agreement where you paid the employees a fixed salary?
>
>        * * *
>
> A.     Not a salary.
>
> Q.     What do you mean not a salary?
>
> A.     You said if I paid them a fixed salary.
>
> Q.     You said not a salary.
>
> A.     Correct. It was an hourly wage.

(*Id.* at 28:2-20).

Plaintiffs indicate that the work schedules created by Beckerman and the spreadsheets produced by defendants with respect to the amount each plaintiff was paid seemingly do not comport with Beckerman's assertion that plaintiffs were paid the prevailing minimum wage. For example, Alvarado was paid two hundred seventy-five dollars ($275.00) for a twenty-six (26)-

4

hour workweek in 2016, which amounts to an hourly rate of approximately $10.57, but, according to Beckerman, the minimum wage on Long Island at that time was ten dollars ($10.00) an hour. (Melendez Opp., Ex. A at 49:10-50:25). For another workweek, Alvarado was paid four hundred thirty dollars ($430.00) for a thirty-nine (39) hour workweek, which amounts to a different hourly rate of eleven dollars and two cents ($11.02). (*Id.* at 61:16-24). When asked why he would pay Alvarado more than the minimum wage, Beckerman testified, *inter alia*, that his practice was "to round up to an even number . . . so [he's] not paying people in quarters, nickels and pennies," (*id.* at 51:10-20); and that the amount paid to Alvarado may have included "tips that he got that [Beckerman] may have passed through to him." (*Id.* at 51:21-62:20, 77:15-21). Beckerman further testified that he did not have any records regarding the amount of tips given to the employees, and their salaries after 2016 would not include tips because he stopped being involved in the collection and distribution of tips. (*Id.* at 56:22-62:4, 77:22-78:5).

Beckerman also could not explain why certain notations on the schedules he produced seemingly indicate that Alvarado was given "something extra" and/or extra money. (Melendez Opp., Ex. A at 65:20-70:11). According to Beckerman, "[m]ore likely than not, [Alvarado] had the tips, and there may have been another bonus in there," although he did not have any records of such bonus. (*Id.* at 70:9-72:5).

In addition, Beckerman was unable to provide a definitive explanation for some of the calculations he made on the works schedules, claiming, *inter alia*, that he did not "know exactly," could not "be certain," was "not sure" or did not know about what some numbers thereon represented; that numbers which were "very close," but did not exactly conform, to his explanation of the calculations, were not legible; that he may have written down a certain

number while using the schedule "as a doodle pad;" that he was not certain and had "no idea" why his schedule did not include an entry for tips, overtime or bonuses; and that if a number did not include a plus sign or "say the word extra," it was "more representative of the amount [Alvarado] would have been paid that week" for his straight salary, exclusive of wages, overtime, bonuses and tips, although that was not so "in every case." (Melendez Opp., Ex. A at 72:8-77:21, 130:14-132:22, 136:19-138:11, 142:23-144:24, 148:12-149:23).

Beckerman is unsure if he provided Chagon with a wage statement; defendants never produced a wage notice for Chagon, Flores or Ramirez; and Beckerman did not provide Chagon with payroll records because he was paid in cash. (Plf. 56.1, ¶¶ 55-57, 59-60). Beckerman also does not remember if he provided Flores with a wage statement, although he testified that one would have been produced to plaintiffs if it existed. (*Id.*, ¶ 58).

### 1.    Alvarado's Employment

Beckerman hired Alvarado in October 2016, determined his rate of pay and paid him in cash off the books for a portion of Alvarado's employment with GC. (Plf. 56.1, ¶¶ 31, 36, 45). Alvarado started working for GC in 2016, stopped working on Memorial Day in 2017, returned to work approximately fourteen (14) to thirty (30) days thereafter, and then was terminated on May 1, 2018. (Melendez Opp. Decl., Ex. A at 36:13-37:24; 78:8-80:4). According to Beckerman, Alvarado's rate of pay was "the prevailing minimum wage," both when he returned to work in 2017 and at the time he left his employment with GC. (*Id.* at 37:25-38:6).

Beckerman gave Alvarado a wage notice, in English, but the date of the wage notice does not coincide with the date when Alvarado was originally hired and/or rehired by GC. (Plf. 56.1, ¶¶ 52, 53).

Beckerman testified that he "would say Spanish" is the "predominant language of the employees that [he] had working at GC," although everybody at GC spoke English "in some capacity;" and that Alvarado's "primary language," at least with him, was English. (Melendez SJ Decl., Ex. E at 35:11-36:6). In addition, Beckerman asserts that he communicated with Alvarado "almost exclusively" in English; that while he was aware that Alvarado speaks Spanish, Alvarado never advised him that he was not comfortable conversing in English, nor did Alvarado ever request that he speak to him in Spanish; that he "has no knowledge of whether Spanish or English is Mr. Alvarado's 'primary language;'" that Alvarado "did not request that the wage acknowledgement form, which was presented to him in English, and which he signed, be provided to him in Spanish;" that Alvarado accepted that form in English, checked the box indicating that English was his "primary language," and signed the form where the employee's signature is required; and that Alvarado never protested the fact that the form was in English, nor requested that he be provided with a Spanish version of the form. (Declaration of Jacques Beckerman dated August 21, 2019 ["Beckerman Decl."], ¶ 5).

In 2017, Alvarado was placed on the books. (Plf. 56.1, ¶ 45). The rate of pay and the hours worked that were chronicled on Alvarado's paystubs were incorrect. (*Id.*, ¶ 44). At times, Beckerman did not input hours worked by Alvarado on his payroll records, and at other times he inputted the incorrect number of hours worked on the payroll records. (*Id.*, ¶ 50).

Alvarado was deposed on May 29, 2019. (Def. 56.1, ¶ 1). With respect to overtime

compensation, Alvarado testified, in relevant part:

> Q.     Mr. Alvarado, were there any weeks when you worked more than 40 hours
> for which you did not receive time and-a-half for the hours in excess of 40?
>
> * * *
>
> A.     No.

(*Id.*, Ex. A at 73:6-14). However, in opposition to defendants' cross motion, plaintiffs submitted

an errata sheet, signed by Alvarado on June 18, 2019, indicating, in relevant part:

> "PG 73 LN 14 NOW READS No SHOULD READ Yes: REASON was
> confused by the question. Thought he was asked whether he
> did receive time and half for hours worked in excess of 40."[3]

---

[33] Rule 30(e)(1) of the Federal Rules of Civil Procedure provides, "On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which: (A) to review the transcript or recording; and (B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them." "A deponent invoking this privilege must sign a statement reciting such changes and the reasons given [] for making them, . . . but the language of the Rule places no limitations on the type of changes that may be made, [] nor does the Rule require a judge to examine the sufficiency, reasonableness, or legitimacy of the reasons for the changes—even if those reasons are unconvincing." *Podell v. Citicorp Diners Club, Inc.*, 112 F.3d 98, 103 (2d. Cir. 1997). "At the same time, when a party amends his testimony under Rule 30(e), the original answer to the deposition questions will remain part of the record and can be read at the trial." *Id.* Since "any out-of-court statement by a party is an admission, a deponent's original answer should be admitted into evidence even when he amends his deposition testimony—with the deponent of course [] free to introduce the amended answer and explain the reasons for the change." *Id.*

However, a party cannot defeat a motion for summary judgment "by submitting errata sheets long after their depositions were taken, or by filing 'supplemental answers' to interrogatories." *Margo v. Weiss*, 213 F.3d 55, 61 (2d Cir. 2000). "There is no reason to distinguish between an attempt to conjure up a triable issue of fact through the proffer of a late affidavit and an attempt to achieve the same end through the submission of delayed errata sheets or supplemental answers to interrogatories. None will defeat a motion for summary judgment." *Margo*, 213 F.3d at 61; *see, e.g. Steinsnyder v. United States*, No. 09-cv-5407, 2013 WL 1209099, at * 4 (E.D.N.Y. Mar. 25, 2013) (holding that a court may disregard untimely corrections to a party's deposition transcript); *Klausner v. United States*, No. CV-06-5005, 2008 WL 11417278, at * 2 (E.D.N.Y. Jan. 3, 2008) ("The failure to timely deliver [a party's] errata sheets would be sufficient reason to disregard them under Rule 30(e)); *Ramos v. New York City Dep't of Corr.*, No. 05-cv-223, 2006 WL 2355839, at * 4 (E.D.N.Y. Aug. 14, 2006) ("[U]ntimely deposition changes are to be disregarded, particularly where they have the effect of creating a disputed issue of fact."); *Winston v. Marriott Int'l, Inc.*, No. 03-cv-6321, 2006 WL 1229111, at * 6 (E.D.N.Y. May 8, 2006) (excluding untimely changes to deposition transcripts for failure to meet the procedural requirements of Fed. R. Civ. P. 30(e)). Alvarado received notice that the transcript of his deposition was available on June 13, 2019. (*See* Melendez Opp., Ex. F). Although his errata sheet is dated June 18, 2019, and plaintiffs contend in their brief in opposition to defendants' cross motion that it was provided to defendants "on or about June 19, 2019," (Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ["Plf. Opp."] at 15), they do not provide proof of service to that effect. Plaintiffs' conclusory and unsupported statements regarding delivery of the errata sheet, without more, are insufficient to establish that

(Melendez Opp., Ex. E).

In addition, Alvarado testified, in pertinent part, as follows:

Q.       What do you understand it to mean that you're the plaintiff in this action?

A.       It's like I have a case from my rights.

Q.       What rights are those?

A.       Because I was let go unjustly, and the rest I can't answer. I have my attorney.

Q.       So, as far as you understand, your lawsuit is because you were let go unjustly?

                    * * *

A.       Not only because of that.

Q.       Could you tell me what other reasons you brought this lawsuit?

A.       Because I was let go and I felt that the way of payment was unjust.

Q.       What do you mean you felt the way of payment was unjust?

A.       There were too many confusions with the payments.

Q.       Could you tell me what confusions with the payments there were?

A.       Because supposedly they pay me like a salary, but there were times that when I took a break they would discounted [*sic*] out per hour.

Q.       Anything else?

A.       Yes.

Q.       What else?

A.       I just did not listen to what the question was.

---

Alvarado's errata sheet was timely served in accordance with Fed. R. Civ. P. 30(e)(1). Nevertheless, even absent the errata sheet, there are genuine issues of material fact arising from other admissible evidence in the record sufficient to defeat defendants' motion seeking summary judgment dismissing Alvarado's claims for unpaid overtime wages.

Q.      You've brought a lawsuit here and you're claiming that there were certain legal wrongs done to you; is that correct?

A.      Yes.

Q.      When did you first learn that there were legal wrongs done to you?

        * * *

A.      When I would receive the payments.

        * * *

Q.      Now, when did you first learn that there was a violation of your legal rights?

A.      When I would receive the payments.

Q.      So, when you received your first payment you knew that there was something that violated the law with respect to that payment; is that correct?

        * * *

A.      Yes.

Q.      What was wrong with respect to that first payment you received with respect to the legality of it?

A.      They did not give me a form of payment.

Q.      What form are you referring to?

A.      When it explains what the payment is, the days.

        * * *

Q.      What legal rights are you claiming in this lawsuit have been violated?

A.      That when I got paid there was no form that showed the payments, days.

Q.      Is that the only legal right you're claiming was violated?

A.      No.

Q.      What other legal rights do you claim were violated?

10

A.      For instance, there were no sick days.

Q.      You're claiming that your legal rights were violated because you were not given sick days; is that correct?

A.      No, not only because of that.

Q.      But that's one of the reasons?

A.      Yes.

Q.      What are the other reasons?

A.      That they did not give me a form to show the form of payment, explain the hours.

Q.      So, we have no sick days and no form. Anything else?

A.      Yes.

Q.      What else?

A.      Also, they are supposed to be paying me a salary, but whenever I got sick for a day they would discount it as it were per hour.

Q.      So, the third claim is that if you were out for being sick you weren't paid for the day; is that correct?

        * * *

A.      Correct.

Q.      Are there any other claims you're making in the context of this case?

A.      No.[4]

        * * *

Q.      So, from the first paycheck you got you knew that your rights were being violated; is that correct?

_____

[4] In his errata sheet, Alvarado changes this answer to "Yes, failed to pay overtime," and indicates that the reason for the substantive change to his answer is that "the way the question was asked was confusing and too sophisticated. I thought that by saying they took hourly deductions from my salary and complaining about the form of how I was paid expressed they owed me overtime." (Melendez Opp., Ex. E).

A.      Correct.

Q.      How did you know that?

A.      Because sometimes they would pay me in cash and sometimes pay me in personal check.

Q.      By that you knew that to be a violation of the law?

        * * *

A.      Yes, because if they gave me a day of rest and sometimes they would deduct it.

        * * *

Q.      Other than what you just testified to as the violations of your legal rights, are you claiming any other legal rights of yours were violated?

A.      I don't know.

Q.      Well, you're here going forward on a lawsuit and I'm asking you, what claims are you making in this lawsuit?

A.      Because of the forms of payment, and also because I was let go unjustified.

Q.      Other than the form of payment being by cash or personal check, other than not being paid for sick days, and other than not receiving the form you talked about, do you have any other claims you're making against the defendants in this case?

A.      The explanation of the form of payment, because if they pay me by salary then why would they deduct per hour whenever I missed a day of work?

Q.      I'm asking you a different question. My question is, other than what you've testified, namely the deductions for when you're not at work, other than not giving you the form, and other than paying you either by personal check or by cash, are you making any other claims against any of these defendants in this case?

A.      Yes.

Q.      What other claims are you making against these defendants?

A.      Because I was offended. I was threatened by a letter that was sent to my attorney.

12

Q.      That's another claim that you're making, that you were threatened by a letter that your attorney received?

A.      Yes.

Q.      Other than that letter and the other matters we discussed, are you making any other claims against any of the defendants in this case?

A.      No.[5]

Q.      You have no other claims of any kind other than the letter that your lawyer received, the failure to get the form, and the form of payment either by cash or personal check, those are the only claims you're making in this case; is that correct?

A.      Yes.[6]

Q.      You're not asserting any other claims of any nature; is that correct?

A.      No.[7]

(Def. 56.1, Ex. A at 5:14-14:7).

However, in an affidavit, dated October 23, 2018, submitted in support of his motion for conditional certification of this case as an FLSA collection action, Alvarado asserts, *inter alia*, (i) that throughout his employment with defendants, he "routinely worked five or six days per week;" (ii) that "[o]n a regular basis [he] worked from 8:00 a.m. to 6:00 p.m., or 9:00 a.m. to 7:00 p.m.," but "[s]ometimes [he] would work until closing, which often times was pass [*sic*] nine o'clock[;]" (iii) that "[d]espite[] the fact that [he] was working more than 40 hours per week[,] defendants did not pay [him] time and a half for the hours worked in excess of 40;" (iv)

_____

[5] In his errata sheet, Alvarado changes this answer to "Yes, failed to pay overtime," and indicates that the reason for the substantive change to his answer is that he "thought it was understood I was claiming overtime by taking hourly deductions from my salary." (Melendez Opp., Ex. E).

[6] In his errata sheet, Alvarado changes this answer to "No" and indicates that he "[t]hought it was understood I was claiming overtime." (Melendez Opp., Ex. E).

[7] In his errata sheet, Alvarado changes this answer to "Yes, claiming overtime pay," and indicates that he "thought it was understood I was claiming overtime by taking hourly deductions from his salary." (Melendez Opp., Ex. E).

that defendants "short changed [him] on hours worked and never paid overtime;" (v) that "[a]t times, Jack Beckerman would say [the detailers] were salaried employees," but at other times, he would say they "were paid by the hour but that he did not pay overtime," and that if they "did not like the way [they] were getting paid to get out;" and (vi) that defendants "continued to deprive [the detailers] of overtime pay" after they complained to Beckerman. (Docket Entry ["DE"] 22-4, ¶¶ 3, 7, 9, 15, 16).

Moreover, in his verified supplemental response to defendants' interrogatory demand, dated April 18, 2019, *i.e.*, prior to his deposition, Alvarado asserts, in relevant part, (i) that, to the best of his recollection, "he estimates working approximately ten [10] hour days five [5] to six [6] days per week for a total of 50 to 60 hours per week;" (ii) that, to the best of his recollection, "he was paid approximately $600.00 per week in cash when he first started working," but his weekly salary increased to about six hundred eighty dollars ($680.00) on or about 2017; (iii) that on or about June 2017, "he was being paid $800.00 per week sometimes in cash and sometimes by check;" (iv) that by March 2018, "he was earning $850.00 per week by check;" (v) that he "was not paid an hourly rate but rather received the above indicated weekly salary;" and (vi) that, to the best of his recollection, he "agrees with times chronicled on [defendants'] work schedules." (Alvarado's Supplemental Response to Defendants' Interrogatory Demand, Melendez Opp., Ex. G, ¶¶ 5-6).

### 2.    Ramirez's Employment

Ramirez worked for GC from June or July 2016 until January 2017. (Def. 56.1, Ex. C at 16). According to Beckerman, Ramirez was paid "minimum wage plus any overtime."

14

(Melendez Opp., Ex. A at 139:8-140:3). However, Beckerman further testified, in pertinent part, as follows:

> Q.      So for the week 7/15 to 7/22, how many hours did you [*sic*] work?
>
> A.      According to this [schedule], 45.
>
> Q.      So what was his pay rate?
>
> A.      $10 an hour.
>
> Q.      So if you [*sic*] worked 45 hours and you paid him $10 an hour, that would be $475. Why did you pay him $550 for that week?
>
> A.      More likely than not there were tips. This was in the beginning as well, before the practice was stopped.
>
> Q.      But there's nothing written on the side of the box indicating tips?
>
> A.      Correct.
>
>                      * * *
>
> Q.      So you have nothing that would help you refresh your recollection of how much you gave this guy for tips, bonuses in cash; is that correct?
>
> A.      For this particular week, no.

(*Id.* at 141:4-142:5).

Ramirez testified that Beckerman told him: "they were going to pay [him] 150 a day;" he would "supposedly" work eight (8) hours per day; and he would be working "eight to six." (Def. 56.1, Ex. B at 12:13-24). Ramirez further testified, in pertinent part:

> Q.      So, you understood the job, that you would be working eight to six and getting $150 every day you worked eight to six; is that correct?
>
> A.      Of course. Yes.
>
>                      * * *

Q.     Did you ever see [GC's] time records before today?

A.     No. The reason we're here is they have to pay the overtime hours. That signifies it's not correct.

Q.     Did you ever see the time records before today?

A.     No.

Q.     So, you don't know if the records contain overtime hours or not; is that correct?

A.     I cannot say because I haven't seen them, but what they were paying me weekly, math doesn't fail.

Q.     Did you keep any records yourself of the hours you worked?

A.     They used to pay me in cash. There's no record.

Q.     Did you keep any records of the amount of hours you worked?

A.     No.

Q.     Did you keep records of the days you worked?

A.     Every week I used to work Monday through Saturday.

          * * *

Q.     Did you ever tell anybody that you weren't getting paid the right amount of money?

A.     Yes. Yes, a co-worker. It was a group of us, and a couple. They were withholding our tips and they weren't paying the overtime hours.

Q.     Let's talk about the first week you worked there. How many hours did you work?

A.     Suppose 60 hours, Monday through Saturday. Ten hours every day.

Q.     Did you get $150 for every day you worked?

A.     That is correct.

Q.      So, for each day you worked the first week you worked ten hours a day; is that correct?

A.      Correct.

Q.      You received 150 for that ten hours; is that right?

A.      That is correct, yes.

Q.      How about the second week you worked, how many days for that week did you work?

A.      Every week what [*sic*] is the same hours. The only time it changed the hours it was me, because I knew how to polish the cars. Let's say sometimes they needed people in Huntington, they would change me, like, two or three days and then I would always come back at my regular hour or time. That is why it's easy for me to know how many hours a week I would do. Let's say one day my hours were not full, it was because maybe I was sick, or something to that effect.

Q.      Could you tell me when that was?

A.      No.

        * * *

Q.      So, between June or July of '16 and January of '17 you worked for GC six days a week every week; is that right?

A.      Yes.

Q.      You were paid $150 per day during that period of time; is that correct?

A.      That is correct.

Q.      You worked ten hours per day each day during that time period; is that right?

A.      Yes.

Q.      When did you first learn that you weren't receiving proper overtime?

A.      When like a month or two went by.

Q.      How did you come to find that you weren't receiving the proper overtime?

17

A.      When I compared what I'm earning and what kind of work I'm doing.

(Def. 56.1, Ex B at 12:25-17:14). According to Ramirez, he found out that he was not getting

overtime by doing research on the Department of Labor website. (*Id.* at 17:15-19:14).

In addition, Ramirez testified, in relevant part:

Q.      During the period of time you worked from June or July through January, were your hours always eight to six?

A.      Yes. As I said before, one or two days when they needed me in Huntington.

Q.      Forgetting about the one or two days, the rest of the time you always worked from eight to six?

A.      Yes.

Q.      There may have been one or two days when the hours were different than that; is that correct?

A.      Yes.

Q.      Are there any weeks in which you were not paid the end of the week $150 per day for each day you worked?

A.      That would depend. Let's say I had a doctor's appointment, I would have to leave early. I would be, like, discounted.

Q.      How much were you discounted if you left early?

A.      I don't know. That depends on them, if I was out a half a day or the hours.

Q.      Well, if you were out an hour was anything deducted from your pay?

A.      I don't remember.

Q.      If you were out a half a day was anything deducted from your pay?

A.      Yes.

Q.      How much?

A.      Half.

18

Q.      Were there any weeks when you got any more than $150 per day?

A.      If I had to work on a Sunday. Not free.

Q.      When did you work on Sunday.

A.      Once or twice.

Q.      How much were you paid on the Sundays that you worked?

A.      The same amount.

Q.      150 per day?

A.      Yes.

Q.      Do you have any records to reflect what Sundays you worked?

A.      No.

(Def. 56.1, Ex. B at 22:19-24:15). According to Ramirez, he spoke with Beckerman and Anthony

Ayala after first learning that he was not getting proper overtime pay and they said, "This is what

we have. If not, you can leave." (*Id.* at 20:12-17).

With respect to the one (1) payroll check that was paid to Ramirez, Beckerman testified,

in pertinent part, as follows:

Q.      At that time you were paying him how much an hour?

A.      2016, $10 an hour, plus any overtime he would have earned.

Q.      Can you turn to GC127? . . . Can you tell me how many hours he worked
for that, week?

A.      This schedule shows 50 hours.

Q.      So if he worked 50 hours, how much should he have earned?

A.      $565.

Q.      40 times 10 is 400.

19

A.      10 hours of overtime at 15. I was doing the math in my head. I didn't use my calculator.

Q.      550. Turn to GC146. Can you tell me why you reported him earning $500 that week?

A.      Well, this was the one check that he had asked for, because he did ask me to process the payroll. And this was the portion that he wanted the check to reflect, and the remainder was paid in cash.

He didn't want to do the entire amount because he didn't want to see what the deductions were going to be. When he saw that there was $42.68, he decided that he didn't want to pay the taxes on that. He got paid in cash for the remainder of his time, which is about another four months.

Q.      You falsified this document at his request?

A.      I didn't falsify it.

Q.      Is it correct?

A.      It's $500.

Q.      That's not what he earned.

A.      Obviously. He earned more.

Q.      So it's not correct; is it?

A.      Well, it's correct, $500.

Q.      And the information here is false; right?

A.      This is what was paid on the books. It's accurate. The remainder was in cash.

Q.      This document is supposed to reflect his total earnings. Does it reflect his total earnings?

A.      If he was paid in cash and he was paid by check.

Q.      The question is does this document reflect his total earnings?

A.      Clearly not.

20

(Melendez SJ Decl., Ex. E at 151:9-153:14)[8].

### 3.    Flores's Employment

Beckerman testified that Flores's rate of pay in 2016 was "probably" the prevailing minimum wage of ten dollars ($10.00) an hour, "plus any overtime that he may have earned;" and that Flores only worked for GC for approximately two (2) to three (3) weeks. (Melendez Opp., Ex. A at 134:19-136:8).

Flores testified that he worked for another company at the Nissan dealership before he worked for GC; that he started working for GC "ever since the company started in Nissan;" and that he worked for GC until "the month of Christmas" in 2016. (Def. 56.1, Ex. C at 8:11-9:6, 24:7-15). Flores further testified that the previous company for whom he worked paid him an hourly rate of nine dollars ($9.00); that he worked eight (8) to nine (9) hours a day; that he worked forty-five (45) hours a week; that he was never paid overtime when he worked more than forty (40) hours a week; and that he was never given any wage statements or checks from his previous employer. (*Id.* at 9:7-10:6).

According to Flores, he started working for GC "when they took over" and asked him to stay. (Def. 56.1, Ex. C at 11:6-9). Flores testified that when he agreed to continue working for GC, Beckerman and Ayala told him "that everything was going to remain the same, and that they would pay me a salary." (*Id.* at 12:11-14). Flores further testified, in pertinent part, as follows:

---

[8] Unlike the other plaintiffs, Ramirez's supplemental response to defendants' interrogatory demand is not verified and, thus, does not constitute admissible evidence. *See, e.g. Cavanagh v. Ford Motor Co.,* No. 13-cv-4584, 2017 WL 2805057, at * 7 (E.D.N.Y. June 9, 2017), *report and recommendation adopted*, 2017 WL 2804934 (E.D.N.Y. June 28, 2017); *Baker v. 221 N. 9 St. Corp.*, No. 08-cv-3486, 2010 WL 3824167, at * 1, n. 3 (E.D.N.Y. Sept. 23, 2010).

Q.      Everything was going to remain the same, so you were going to get $9 an hour or something was going to change about that?

A.      A salary.

Q.      You weren't getting a salary before, were you?

A.      No, hourly.

Q.      What salary were you supposed to get?

A.      600 a week.

Q.      That's what they told you?

A.      Yes.

Q.      Did they tell you how many days a week you would be working for the $600?

A.      Yes.

Q.      How many days were you going to be working for the $600?

A.      They told me I would work six days.

Q.      How many hours a day were you going to work for the $600?

        * * *

A.      Supposedly, it was supposed to be 40 hours, but I would always work 60 hours.

Q.      My question to you is not how much you actually worked, but when you spoke to them, what did they tell you would be the number of hours you would be working?

A.      Like he wrote down, like, on the schedule that I was going to work 40 hours, but then he would change the schedule.

Q.      So, according to the schedule you were supposed to work 40 hours a week; is that correct?

A.      Yes.

22

Q.      When you first spoke to him, that's what he told you you would be working, 40 hours a week?

A.      Yes.

Q.      You were going to work six days a week, that's what he told you?

A.      Yes.

Q.      How many hours a day were you supposed to work?

A.      Nine, eight hours, seven. He said, like, for me to make the 40 hours, but I would  always work more than that.

Q.      I'm just talking about that conversation you had at that time. Did he tell you at that conversation what time you would be starting every day?

A.      Yes, 40.

Q.      What time were you supposed to start?

A.      Nine, and I would get out at four.

Q.      You were going to do that six days a week, that's what he told you; is that correct?

A.      Yes.

(Def. 56.1, Ex. C at 12:15-14:20)[9]. In addition, Flores testified, in pertinent part:

---

[9] Contrary to defendants' contention, Flores's testimony is not so "contradictory and incomplete, [or] so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations." *Adamson v. Miller*, 808 F. App'x 14, 16 (2d Cir. Apr. 9, 2020) (summary order); *see also Gurvey v. Cowan, Liebowitz & Latman, P.C.*, 757 F. App'x 62, 64 (2d Cir. Dec. 4, 2018) (summary order), *cert. denied*, 140 S. Ct. 161, 205 L. Ed. 2d 52 (2019), *reh'g denied*, 140 S. Ct. 576, 205 L. Ed. 2d 376  (2019) ("[I]n certain cases a party's inconsistent and contradictory statements transcend credibility concerns and go to the heart of whether the party has raised *genuine* issues of material fact to be decided by a jury." (emphasis in original)). Rather, the credibility of Flores's testimony is a matter for the jury, not for the Court on summary judgment. *See generally Gurvey*, 757 F. App'x at 64 ("A district court generally may not make credibility assessments when evaluating the evidence at the summary judgment stage."); *e.g. Matheson v. Kitchen*, 515 F. App'x 21, 24 (2d Cir. Mar. 21, 2013) (summary order) (holding that district courts are not authorized "to engage in searching, skeptical analyses of parties' testimony in opposition to summary judgment; and that where the substance of a party's testimony "cannot fairly be characterized as fundamentally inconsistent or incoherent," the district court cannot usurp the function of the jury and reject the credibility of the party's testimony); *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010) (holding that generally, "the assessment of a witness's credibility is a function reserved for the jury" and that the exception to that rule, "for the rare circumstance where the plaintiff relies almost exclusively

23

Q.      When you began working for GC services, that first day did you start working nine o'clock?

A.      No. At eight.

Q.      But he told you you would start at eight; is that correct?

A.      Yes. But like about a week after we – they started, then he told me they were going to change the schedule and that I would work from nine until four or five.

Q.      The first day, what time did you start working?

A.      At eight.

Q.      But the day before he told you you would start at nine; is that right?

A.      No. [Beckerman] spoke with the bosses [of the dealership] and he said they were going to change the schedule, so that's when we started working, from that time on we started at nine.

        * * *

Q.      How do you know he spoke to the bosses?

A.      He told me. He told me was going to change the schedule so we can start later.

Q.      When did he tell you that?

A.      When he started working there he told us.

Q.      You had a conversation with him pursuant to which he hired you; is that correct?

A.      Yes.

Q.      When did you start working for him in relationship to that conversation, that day, the next day, sometime later?

A.      Days later.

---

on his own testimony, much of which is contradictory and incomplete," is not applicable where the testimony "was not contradictory or rife with inconsistencies such that it was facially implausible.")

24

Q.      A few days later?

A.      Yes.

Q.      When did he tell you the hours were going to change?

A.      Like days after he spoke with the bosses.

Q.      When is that in relationship to the time that you actually started to work?

A.      When they started working there.

Q.      The first day you started to work; is that right.

A.      Yes.

Q.      What time did you get there that first day?

A.      At eight.

Q.      What time did you leave that first day?

A.      Five.

Q.      So, the first day you worked from eight to five; is that right?

A.      Yes.

Q.      But you were told you were going to work nine to four; is that right?

A.      Yes.

                * * *

Q.      On that first day when you worked the extra two hours, did you tell anybody that you worked two hours more than you were supposed to work?

A.      I told him [Beckerman] I was working extra and he said that he would pay me a salary.

Q.      He already told you he was going to pay you a salary when he talked to you about hiring you a few days before; is that correct?

A.      Yes.

25

Q.      Did he tell you the salary is going to change?

A.      No.

* * *

Q.      The second day you worked, what time did you begin and what time did you end?

A.      At eight.

Q.      What time did you end?

A.      Five.

Q.      How many days did you work during the first week?

A.      The entire week until Saturday.

Q.      Six days?

A.      Yes.

Q.      Then you received a salary of $600; is that correct?

A.      Yes.

Q.      Who gave you that money?

A.      Jack [Beckerman].

Q.      Did you say anything to him when he gave you the $600?

A.      No, because I told him before.

Q.      When did you tell him before?

A.      Because I was – you know, that I told him that he needed to pay me for the time that I was working, the extra time, and he said he would give me a set salary and that he would pay me every 15 days.

Q.      When did you first tell him you were working extra hours?

A.      About a week later.

26

Q.      Before or after he gave you the first payment?

A.      When he made the first payment.

Q.      At the time he made the payment you told him you were working extra hours; is that correct?

A.      Yes.

Q.      What did he say to you?

A.      He said that he will be rewarding later, but he never gave me anything.

Q.      Did you ask him what he meant when he said he would be rewarding you later?

A.      That he was going to give me more money.

Q.      How much more money was he going to give you?

A.      He said that whenever I go past the amount of hours that I was supposed to that he would give me extra money, but he never did.

Q.      Well, that first week you worked extra hours; is that right?

A.      Yes.

Q.      Did you ask him where the extra money was when he gave you the $600?

A.      Yes. Yes, but then he said he will set a salary, and after that I didn't ask him anything else.

Q.      You asked him that first payment day and he told you you would have a set salary; is that right?

A.      Yes.

Q.      After that you never asked him again, right?

A.      No.

Q.      So, you asked him that one time and never again, correct?

A.      I told him about two times.

27

Q.      When was the second time?

A.      Whenever he will pay me, like he said he would pay me every 15 days, when he will pay me he will give me, pay me the 15 days, but for months –

Q.      How many times did you ask him about getting extra money?

A.      Whenever he will pay me, like on a few occasions. For example, if he would pay me Saturday, the next Saturday he wouldn't pay me, then pay me the following Saturday, but he wouldn't pay me that Saturday, he would pay me the following week.

Q.      How many times did you talk to him about getting extra money?

A.      When he will pay me and then I stopped doing it because then he would get upset.

Q.      How many times did you talk to him about it?

A.      About three times, maybe.

(Def. 56.1, Ex. C at 15:13-24:3).

Flores further testified, in relevant part, as follows:

Q.      How much money are you claiming you weren't paid?

A.      The overtime.

Q.      How much are you claiming you are owed for overtime?

A.      I don't know.

Q.      Just so we are clear here, you're saying that the schedules only were wrong because they didn't reflect your accurate hours and they had three days off that you didn't take; is that correct?

        * * *

A.      Yes.

Q.      The rest of the schedules were complete, though; is that correct?

28

A.      But they were not correct because times if we have [*sic*] I would start at 12 until closing, until nine or ten o'clock.

Q.      So, sometimes you would start at 12 o'clock; is that right?

A.      Yes.

Q.      How many times did you start at 12 o'clock?

A.      Sometimes twice a week. Three times. It would change.

Q.      So, two or three times a week you would start at 12 o'clock; is that right?

A.      Yes.

Q.      Do you have any records of any kind to show when you started and when you finished on each day you worked?

A.      No.

Q.      Do you have any records to reflect how much pay you received?

A.      No.

Q.      Can you tell me what days you started to work at 12 o'clock?

A.      The schedule would change. Then the following week, you know, he said you are going to work these days and he would change them. Sometimes it would be a Monday or a Wednesday.

Q.      The week that you had three days off according to the schedule when you really worked, was your pay deducted?

                * * *

A.      I never had three days off. I only had Sundays off.

Q.      On the week that the schedule reflected you were off for three days you were paid the same amount of money, though, right?

                * * *

A.      That's not the right schedule.

29

Q.      My question is this. There was a week when you didn't take three days off, but the schedule showed you took three days off; is that correct?

A.      Yes.

Q.      How much were you paid that week?

A.      The salary, 600.

Q.      So, even though the schedule had you off for three days you were paid for those three days, right?

                    * * *

A.      I would always work the six days.

(Def. 56.1, Ex. C at 30:6-32:24).

Additionally, in his verified supplemental response to defendants' interrogatory demand, dated April 16, 2019, Flores asserts, in relevant part, (i) that, to the best of his recollection, "he estimates working approximately ten [10] hour days five [5] to six [6] days per week for a total of 50 to 60 hours per week;" (ii) that he "was paid exclusively in cash;" (iii) that, to the best of his recollection, "he was paid approximately $600.00 per week in cash;" (iv) that he was paid biweekly; (v) that he "was not paid an hourly rate but rather received the above indicated weekly salary;" (vi) that he "disagrees with the defendants [*sic*] work schedules as they state he only worked two weeks[,]" but he actually "worked until December 2016"[10]; (vii) that he "also disputes the hours reported on the work schedules," because he "alleges that when he first started working he started at 8:00 a.m. and worked until 5 or 6 p.m. The start date [*sic*] was later changed to 9:00 a.m. and [Flores] would work until approximately 6:00 p.m.;" and (viii) that he

---

[10] Elsewhere in his supplemental interrogatory response, Flores asserts that Beckerman terminated his employment at GC "on or about November 2016." (Flores' Supplemental Response to Defendants' Interrogatory Demand ["Flores Supp. Interr."], Melendez Opp., Ex. G, ¶ 10).

would also occasionally work from 9:00 a.m. to 9:00 p.m. (Flores Supp. Interr., Melendez Opp., Ex. G, ¶ 6).

4.      Chagon's Employment

In his affidavit, dated October 24, 2018, submitted in support of plaintiffs' motion for conditional certification of this case as an FLSA collective action, Chagon asserts, in relevant part, (i) that he worked for GC from on or about February 2, 2016 until on or about May 1, 2016; (ii) that during his tenure, he "routinely worked five or six days per week" and regularly worked from 11:00 a.m. to 8:00 p.m., or 11:00 a.m. to 9:00 p.m., although "[s]ometimes [he] would work until closing;" (iii) that "[o]n a regular basis [he] worked ten hour days;" and (iv) that he discussed with his co-workers, including Alvarado, "the fact that Defendants were not paying [them] overtime." (DE 22-5, ¶¶ 2, 3, 9).

In his verified supplemental response to defendants' interrogatory demand, dated April 2019, Chagon asserts, in relevant part, (i) that, to the best of his recollection, he began working for defendants on or about February 4, 2016 and "he estimates working approximately ten hour days five to six days per week for a total of 50 to 60 hours per week;" (ii) that he "was paid $1440.00 bi weekly [*sic*] by check for a portion of his employment;" (iii) that, to the best of his recollection, "he was paid approximately $720.00 per week at times in in [*sic*] cash;" (iv) that he "was not paid an hourly rate but rather received the above indicated weekly salary;" (v) that, "to the best of his recollection [he] does not agree with the work schedules produced by the defendants," insofar as the work schedule he produced for the week March 18, 2016 to March 24, 2016 "do[es] not reflect the same hours" as the schedule produced by defendants; and (vi)

31

that Beckerman terminated his employment with GC on May 1, 2017. (Chagon's Supplemental Response to Defendants' Interrogatory Demand, Melendez Opp., Ex. G, ¶¶ 6, 10). Chagon similarly testified that he was paid every two (2) weeks, and that Beckerman promised him a salary of one thousand four hundred forty dollars ($1,440.00) every two (2) weeks. (Def. 56.1, Ex. D at 14:5-11).

Additionally, during his deposition, Chagon testified, in pertinent part,

Q.     Fabio, on a regular workweek, what time did you go to work?

A.     What's on the schedule?

Q.     Yes.

A.     From 11 in the morning until closing.

Q.     What time did the shop close?

A.     Sometimes nine. Sometimes ten.

Q.     How many days a week did you work?

A.     Six.

(Def. 56.1, Ex. D at 27:19-28:3). Chagon further testified, in pertinent part;

Q.     Did you ever see any time records?

A.     Yes, that, yes.

Q.     What was it that you saw?

A.     An hour that was written down opposite to what I had.

Q.     So, you're saying that the time records you saw were not accurate, is that what you're saying?

A.     Yes.

Q.     What, specifically, was not accurate in what you saw?

A.      It's the same date and the same – around the same time, but it was different hours than what I had.

Q.      What was different hours?

A.      I don't recall exactly, but it was different.

Q.      It was different than your records.

        * * *

A.      Yes.

Q.      What records do you have?

A.      I had some photos of the schedule.

Q.      How many photos of the schedule did you have?

A.      I believe I only had one or two. I don't recall.

Q.      What did you do with those photos of the schedule?

A.      I have them in an old telephone.

Q.      Other than those one or two schedules that you just testified to, do you have any other records to reflect the times you worked?

A.      No.

Q.      Do you have any recollection of the times you worked?

A,      No, not exactly.

Q,      You say not exactly. What does that mean?

A.      I can't recall exactly because it's been a long time now and it was different each week.

Q.      So, as you sit here today, you don't have any recollection of any specific days or hours you worked, would that be fair to say?

        * * *

33

A.      Yes.

* * *

Q.      So, what you received was a schedule in advance of the workweek; is that correct?

A.      Yes.

Q.      There were times when you would work more hours than showed up on the schedule, is that fair to say?

A.      Yes.

Q,      Were there times that you worked fewer hours than what would show up on the schedule?

A.      No. The schedule was always correct, the scheduling for the hours.

Q.      But you said sometimes you would work more hours than what was on the schedule; is that correct?

A.      Yes, on Sundays.

Q.      But you never worked fewer hours than what was on the schedules, is that your testimony?

A.      Yes. Sometimes it would be different weeks.

Q.      What do you mean by different weeks?

A.      Some weeks we would have more hours. Some weeks less hours.

Q.      So, the records you have only reflect the schedules, they don't reflect the amount of time you actually worked; is that correct?

* * *

A.      Yes.

(Def. 56.1, Ex. D at 7:3-10:20).

Chagon also testified, in relevant part, as follows:

Q.      Did you discuss the terms of your compensation with [Beckerman]?

A.      No.

        * * *

Q.      Before you began to work for GC Services, did you discuss the terms of your compensation with anybody?

A.      No.

Q.      You just started to work; is that correct?

A.      Yes.

Q.      How often were you paid?

A.      Every two weeks.

Q.      How much did you get every two weeks?

A.      He promised a salary of $1,440 every two weeks.

Q.      Who promised that salary?

A.      Jack [Beckerman].

Q.      When did he do that?

A.      When I spoke to him about starting that job.

Q.      So, he discussed the salary with you before you started that job, is that right?

A.      Yes.

        * * *

Q.      Did you discuss with him overtime?

        * * *

A.      I don't think so.

        * * *

Q.      What did [Beckerman] specifically tell you were the terms of the employment? By that I mean your compensation and how many hours you were going to work and on what basis you were going to be paid.

A.      He said he was going to pay cash. Sometimes there would be weeks when he would pay with personal checks.

Q.      What else did he tell you, anything?

A.      No.

Q.      Did he tell you how many hours a day you would be working?

A.      No, because he said it would depend on the movement.

Q.      Did he tell you how many days a week you would be working?

A.      Yes.

Q.      What did he tell you about that?

A.      That I was going to be working six days.

Q.      The salary was fixed regardless of the number of hours you were working, is that your testimony?

A.      Yes. He did state a salary, but there were weeks we would work a lot of hours.

Q.      Did you discuss with him how many hours you would be working in consideration of that salary?

A.      Yes, but he would always say the following week I'm just going to cut down some hours.

Q.      What were the most hours you worked any week?

A.      Sixty.

Q.      You never worked more than 60 hours in any week?

A.      I believe so on Sundays when they would close late.

Q.      How often was that?

36

A.      Every half of the month and every end of the month.

Q.      Twice a month?

        * * *

A.      Yes.

Q.      How many extra hours were you working two times a month?

A.      Extra more than the 60?

Q.      Correct.

A.      Eight.

Q.      How often did that happen?

A.      In the middle of the month and at the end of the month when it would be the busy days.

Q.      So, twice a week [*sic*] you worked more than 60 hours a week; is that correct?

A.      Yes.

Q.      Did you ever discuss with [Beckerman] about extra compensation for those extra hours?

A.      Yes, but he would also say the following week I just won't make you work as many hours, but I would still work those hours.

Q.      So, he cut back on your hours a week after you worked the extra hours, is that your testimony?

        * * *

A.      Yes, but he wouldn't cut them.

Q.      So, when the hours were not getting cut did you discuss with him being compensated for the extra hours?

A.      Yes.

* * *

Q.      What, specifically, did you say to him?

A.      Why he was not paying the extra hours, and then the following week he would say you're going to make less hours, but he would always pay the same.

Q.      After the following week when you ended up working the same number of hours did you say anything to him?

A.      Yes.

Q.      What would he say to you then?

A.      Always the same thing. The following week. Next week.

Q,      How many times did he say that?

A.      Many times.

Q.      Did you ever say to him something to the effect of you have been telling me this for X number of weeks and it's never happened?

A.      Yes.

Q.      What would he say to you?

A.      The same thing. Sometimes he would respond and sometimes he would not.

(Def. 56.1, Ex. D at 13:16-19:10). In addition, Chagon testified, in relevant part, as follows:

Q.      Are there any weeks that you claim that you didn't receive 720 per week or 1,440 every two weeks?

A.      Yes.

Q.      When did you not receive that amount of money?

A.      I don't recall exactly.

Q.      How many times did you not receive that amount of money?

A.      No. I don't recall exactly.

38

Q.      Do you have an estimate?

A.      No.

Q.      Was it more than one time?

A.      Yes.

Q.      Was it more than five times?

A.      I think so.

Q.      Do you have any records to reflect that?

A.      No.

Q.      When you got less than the 1,440 every two weeks how much did you get?

A.      No, I can't recall exactly.

Q.      Do you have an estimate?

A.      I wouldn't have that because I don't remember that.

                * * *

Q.      Other than your recollection that twice a month you worked extra hours, you don't have any specific recollection of the hours which you worked; is that correct?

                * * *

A.      No.

Q.      No, you don't have records or you do have records?

A.      Yes.

Q.      Yes, you have records? I'm trying to not put words in your mouth. Do you have specific records as to any specific hours that you worked?

A.      I believe so. I have some photos of some schedules.

                * * *

39

Q.      Do you have any other records other than that one as to the schedules?

A.      No.

* * *

Q.      You have no actual time records; is that correct?

A.      No.

* * *

Q.      You never maintained any records of the amounts you received, did you?

A.      No.

Q.      As you sit here now, could you tell me how much you received each week?

A.      No, I don't recall.

* * *

Q.      Fabio, on a regular workweek, what time did you go to work?

A.      What's on the schedule?

Q.      Yes.

A.      From 11 in the morning until closing.

Q,      What time did the shop close?

A.      Sometimes nine. Sometimes ten.

Q.      How many days a week did you work?

A.      Six.

(Def. 56.1, Ex. D at 21:24-28:3)[11].

_____

[11] Like Flores's testimony, Chagon's testimony is not so "contradictory and incomplete, [or] so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations." *Adamson*, 808 F. App'x at 16. Rather, Chagon's testimony is "more accurately characterized as ambiguous, confusing, or [] incomplete," rather than incredible, *Simcoe v. Gray*, 577 F. App'x 38, 41 (2d Cir.

40

Beckerman testified that Chagon's rate of pay was "$11 an hour in 2017," and that he was paid in cash. (Melendez Opp., Ex. A at 121:23-122:6). However, Beckerman also testified, in pertinent part, as follows:

Q.      How many hours did Mr. Chagon work for the week of 2/11 to 2/17?

A.      It looks like 51.

Q.      His pay rate was $11 an hour?

A.      Correct.

           * * *

Q.      Do you see Exhibit A where it says for the week 12/11 to 12/17 he was paid $625?

A.      Okay.

Q.      If you turn to GC108, he earned $11 per hour. He should have been paid 561. Why did you pay him 625?

A.      So calculating that, he was entitled to $621 for his base rate and then overtime. And you say he was paid $625; is that correct?

Q.      No. 40 times 11 is 440.

A.      Correct, plus the 11 hours at 16 and a half is 181.

Q.      181.

A.      So that's a total of 621. He was paid 625.

Q.      Why doesn't it match?

A.      As I had testified earlier, I would always round up an odd number like that. It's very close. That's easily my practice, $4.

(Melendez Opp., Ex. A at 125:3-126:6).

---

Aug. 27, 2014) (summary order); and the credibility of his testimony is, thus, a matter for the jury; not for the Court on summary judgment.

5.      Prelitigation Negotiations

By letter to GC and Jennifer Ayala, dated May 3, 2018 (the "Demand Letter"),

Alvarado's counsel indicated, in relevant part:

> "Mr. Alvarado alleges that you failed to pay him wages and overtime pay in
> violation of the [FLSA and NYLL]. Lastly, the company is in violation of the
> Notice requirements of the [NYLL] by failing to account for all the hours Mr.
> Alvarado worked on his pay stubs.
>
> Based on the liability associated with the accusations, and the injuries [Alvarado]
> has suffered, I have been authorized to attempt to settle the matter before protracted
> litigation is entered into. In the event, settlement negotiations cannot be reached,
> on the above-mentioned issue, it is [Alvarado's] intention to initiate a law suit [*sic*].
>
> * * *
>
> Mr. Alvarado's rights under the [FLSA and NYLL] have been violated. The
> [FLSA] allows compensatory, and liquidated, damages for violations of the Act. In
> addition attorneys' fees are available. It is in the interest of all parties involved to
> settle this matter before entering into the cost of protracted litigation. Thus, Mr.
> Alvarado is willing to resolve the matter. As you are aware, *cases such as these can
> develop tentacles*. Left unresolved the prospective plaintiff will move for collective
> action certification.
>
> Please contact the undersigned if you are interested in settling the matter amicably.
> In the event I do not hear from you within seven (7) days of receipt of this letter I
> will proceed accordingly."

(Melendez SJ Decl., Ex. I) (emphasis added).

By letter dated May 5, 2018 (the "May 5, 2018 Letter"), which was signed by Jennifer

Ayala, defendants responded to Alvarado's Demand Letter. (Melendez SJ Decl., Ex. D). The

May 5, 2018 Letter provides, in pertinent part:

> "Pursuant to your letter dated May 3, 2018, we are providing you with a formal
> response to better inform you of the events that led to your client's termination on
> May 1, 2018 at 11 am EST.
>
> As you have suggested, we too would like to amicably resolve this matter. We will
> refer to Mr. Alvarado as 'Employee' herein for simplicity.

* * *

Lastly, the cause for termination:

> Several months ago, 'Employee' insisted on recording his own personal hours 'worked' and to have us reflect them accordingly on his 'paystubs'. I reminded him that he was on salary and 'Employee' replied 'I know, I know, but I really need it done'. We did not think that such a request was unreasonable and granted it to him accordingly. 'Employee' was a great Manager. He was always very diligent in ensuring that the workload was handled and that the employees did their jobs.

> I recall an instance where we did not put the 'hours' on his stub. It was an honest oversight that day. He had become enraged and we didn't understand why he couldn't simply write the hours on his stub."

(Melendez SJ Decl., Ex. D). Jennifer Ayala testified that she did not personally have the conversation with Alvarado regarding the paystubs; that she does not even know Alvarado and never saw his payroll records; and that she did not remember ever putting the hours on his paystub. (*Id.*, Ex. A at 38:18-39:10, 39:22-40:21).

The May 5, 2018 Letter further provides, in pertinent part:

> "Last week, 'Employee' was boasting how he had 'tricked' us into putting hours on his paystub to avoid having his Medicaid/Suffolk County Social Services Benefits affected as long as his hours remained within a certain range.

> It was this discovery that made us very concerned about his moral character. We confronted him with this information and he admitted that this was in fact the case. As a result of him knowingly and willfully steering us to 'record' his 'hours' for a fraudulent act 'Employee' was immediately terminated.

> 'Employee' does not have to be a student of law to fully grasp the implications of Medicaid/Benefits Fraud, to understand that there are real life consequences to such an act. There are multiple agencies to contend with once a claim of abuse is set in motion. Federal, State and local agencies, each charged with governing a case of Fraud and Abuse. *These cases have a way of growing tentacles in a profound way*. Families have been torn apart in many cases and we would not wish that on anyone.

> We appreciate that you may have a long standing [*sic*] relationship with your client regarding past legal matters and as such, we feel that any advice to proceed and/or begin any protracted litigation on his behalf or others would be ill-advised.

43

It is our strong belief that to avoid a catastrophic cascade of legal events from occurring, that we simply leave this matter at rest.

Should you have any further concerns regarding this matter, **please be assured that at this point** we will not be pursuing any legal action(s) against your client and will consider his allegations, accusations and injuries a moot conversation.

Please contact us within seven (7) days of receipt of this letter so that we may proceed accordingly."

(Melendez SJ Decl., Ex. D (italics added; bold emphasis in original)). Jennifer Ayala testified that she did not personally hear Alvarado boasting about tricking defendants to put hours on his paystubs or otherwise have a conversation with him regarding the paystubs, and reiterated that she does not even know him. (Def. 56.1, Ex. A at 40:22-41:8).

Jennifer Ayala saw the May 5, 2018 Letter before it was sent to Alvarado's counsel and signed it, (Plf. 56.1, ¶¶ 15-16), but Beckerman mailed the May 5, 2018 Letter. (*Id.*, ¶ 16; Melendez SJ Decl., Ex. A at 34:21-25; Def. 56.1, Ex. A at 41:9-14). Jennifer Ayala testified that she did not write the May 5, 2018 Letter, (Melendez SJ Decl., Ex. A at 39:13-14); that she did not recall who wrote the May 5, 2018 Letter or whether she read the letter before she signed it, (*id.* at 35:2-22, 36:14-17, 38:12-14, 39:17-18); and that she did not know how many people were authorized to write letters for GC. (*Id.* at 36:18-20). When asked specifically about a paragraph in the May 5, 2018 Letter indicating, "[u]nfortunately, 'Employee's' position and amount of annual salary would disqualify 'Employee' from receiving overtime in accordance with FSLA 29 CFR 541 Section 13(a)(1) and would not fall under the purview of CFR 785.49. Exempt vs. Non-exempt," (*id.*, Ex. D at p. 1), and whether it was her position that Alvarado "is an exempt employee," Jennifer Ayala testified that she did not "know what that means." (*Id.*, Ex. A at 35:11-25, 36:21-23). She also testified, *inter alia*, that she did not know: (i) if Alvarado was a

44

manager at GC; (ii) whether Alvarado was an "hourly employee," as asserted in the May 5, 2018

Letter; or (iii) why the May 5, 2018 Letter indicates that "'Employee' was acting in the

position/capacity of Manager and . . . would in fact be classified an 'Exempt' individual." (*Id.*,

Ex. A at 36:24-37:24).

Furthermore, Jennifer Ayala testified that she did not know why she signed off on the

May 5, 2018 Letter or why the letter was sent; and she did not remember "why all the

information in th[e] letter was written" or for what purpose the letter was written. (Def. 56.1, Ex.

A at 41:15-43:10). In addition, Jennifer Ayala testified as follows:

> Q.    And you have no idea why [the May 5, 2018 Letter] was written?
>
> A.    Yes.
>
> Q.    Did you have any idea of what the contents were?
>
> A.    No.
>
> Q.    You just blindly signed off on a letter because someone told you to?
>
> A.    Yes.
>
> Q.    And you don't remember who it was that told you to?
>
> A.    That's right.

(*Id.* at 43:8-19).

Beckerman asserts, *inter alia*, (i) that, to the best of his knowledge, Alvarado "resides in

[the] United States legally;" (ii) that during Alvarado's employment with GC, he provided a

social security number; and (iii) that Beckerman "is and was not aware of any crime being

committed by Mr. Alvarado" with respect to his immigration status. (Beckerman Decl., ¶ 3).

According to Beckerman, "there came a point in time" when Alvarado advised him "that the

reason for his previous request to have his hours incorrectly reflected on his pay stub was so that he could continue to receive social services benefits," but he did not inquire further into that matter; and when GC received Alvarado's Demand Letter, it was "clear that the inaccurate pay stubs formed the basis for Mr. Alvarado's claim for unpaid overtime." (*Id.*).

Beckerman maintains that it was GC's intention in sending the May 5, 2018 Letter to advise Alvarado "that if he should make such a claim, that GC Dealer's defense would be founded upon Mr. Alvarado's representation to [Beckerman] that he 'needed' his hours so reflected in order to receive or continue to receive some manner of social services benefit[,]" and that "[a]s such, the information was going to be made a part of a public record." (Beckerman Decl., ¶ 3). According to Beckerman, GC "never intended to threaten (or, as plaintiff alleges, 'harass,') Mr. Alvarado with this allegation. It merely wanted him to be fully apprised of the consequences which would necessarily follow from this action placing the facts into the public domain, much as counsel's letter advised defendants of the consequences of the failure to enter into a settlement." (*Id.*).

Additionally, Beckerman asserts that Alvarado's Demand Letter was "a settlement proposal, purportedly in an effort to 'settle the matter before protracted litigation is entered into,'" and that GC's May 5, 2018 Letter "was a counter-proposal as how the parties could resolve their differences without the need for costly and time-consuming judicial intervention. Indeed, that is precisely why the language of the May 5 letter tracks, at times word-for-word, the language of the demand letter." (Beckerman Decl., ¶ 4). According to Beckerman, "the language of the May 5 letter was designed to mirror the language of the 'demand letter' and, as such, was not, nor was it intended to be threatening, any more than the 'demand letter.'" (*Id.*)

46

Defendants further note that Alvarado submitted the following responses to their interrogatories:

> 2.     Within one year proceeding his employment with [GC] was plaintiff receiving any social services benefits, food stamps, unemployment and/or any type [of] insurance benefits? If answered in the affirmative, did he make any representation with respect to his employment in order to receive such benefit. (including but not limited to hours worked and/or rate of pay)? If yes, provide: (i) the date of the application; (ii) the agency to whom the application was made; (iii) the representations made with respect to employment.
>
> **Response**:     Within one year preceding his employment Plaintiff Alvarado's Children received Health First Insurance. The original application was filed in 2012 and supplemented with the birth of each child. The Plaintiff was required to submit proof of gross income.
>
> 3.     At any time during plaintiff's employment with GC Dealer, did plaintiff make any application for a renewal or continuation of previously granted social services benefits, food stamps, unemployment and/or any type insurance benefits? If answered in the affirmative, did he make any representation with respect to his employment on such application. (including but not limited to hours worked and/or rate of pay)? If yes, provide: (i) the date of the application; (ii) the agency to whom the application was made; (iii) the representations made with respect to employment.
>
> **Response**:     Plaintiff renewed his children's Health First Insurance on or about November 2017. Plaintiff was required to submit proof of gross revenue.

(Declaration of Jennifer Ayala dated August 22, 2019 ["J. Ayala Decl."], Ex. B). According to defendants, Alvarado, thus, admitted that he was receiving a social services benefit, *i.e.*, subsidized insurance for his children through Health First[12].

---

[12] Healthfirst NY Child Health Plus ("CHP") is an insurance plan sponsored by New York State which provides no or low-cost healthcare coverage for the children under the age of nineteen (19) years of uninsured or underinsured families who do not qualify for Medicaid. *See* www.healthfirst.org/child-health-plus-plan (last visited Nov. 3, 2020); www.health.ny.gov/health_care/child_health_plus (last visited Nov. 3, 2020). Monthly premium costs depend on gross family income, *e.g.*, there are no monthly premiums for families whose income is less than 1.6 times the poverty level; for higher incomes, the monthly premium depends upon income and family size; and if the family's income is more than four (4) times the poverty level, they pay the full monthly premium charged by the health plan. www.health.ny.gov/health_care/child_health_plus/eligibility_and_cost.htm (last visited Nov. 3, 2020); *see also* N.Y. Pub. Health Law § 2511(3) and (5). The eligibility requirements for such child subsidy payments are set forth in Section 2511 of the New York Public Health Law, which, at the time of Alvarado's initial application for

B.      Procedural History

On or about May 16, 2018, Alvarado commenced this collective action against

defendants alleging, *inter alia*, violations of the FLSA and the NYLL. Issue was joined by the

service of an answer on behalf of defendants on July 18, 2018. On July 24, 2018, defendants

filed an amended answer to the complaint.

On November 6, 2018, Chagon filed a Consent to Joinder to become a party plaintiff in

this action.

By order dated November 29, 2018, *inter alia*, the Court conditionally certified this case

as an FLSA collective action and directed that any and all consent to join forms be submitted to

---

CHP in 2012, provided, in relevant part, that "[i]n order to be eligible for a subsidy payment pursuant to subdivision three of this section, a child shall meet the following criteria: (a) . . . (iii) effective September first, two thousand eight, resides in a household having a gross household income at or below four hundred percent of the non-farm federal poverty level (as defined and updated by the United States department of health and human services); (b) is not eligible for medical assistance, . . . (c) does not have health care coverage under insurance, . . . [and] (e) is a resident of New York state." N.Y. Pub. Health L. § 2511(2)(i). Such income documentation included, *inter alia*, "one or more of the following for each parent and legally responsible adult who is a member of the household and whose income is available to the child; (A) current annual income tax returns; (B) paycheck stubs; (C) written documentation of income from all employers; or (D) written documentation of income eligibility of a child for free or reduced breakfast or lunch through the school meal program certified by the child's school, . . . [or] (E) other documentation of income (earned or unearned) as determined by the commissioner, provided, however, such documentation shall set forth the source of such income." *Id.*, § 2511(2)(f)(iii). In order to establish income eligibility at recertification in 2016, 2017 and 2018, "the commissioner may make a redetermination of eligibility without requiring information from the individual if able to do so based on reliable information contained in the individual's enrollment file or other more current information contained in databases to which the commissioner has access. . . . The commissioner shall require an attestation by the household that the income information contained in the enrollment file or obtained from electronic data sources is accurate. Such attestation shall include any other household income information not obtained from an electronic data source that is necessary to redetermine a child's financial eligibility for a subsidy payment under this title." *Id.*, § 2511(2)(f)(ii). "In the event that there is an inconsistency between the income information attested to by the household and any information obtained by the commissioner from other sources pursuant to this subparagraph, and such inconsistency is material to the household's eligibility for a subsidy payment under this title, the commissioner shall require the household to provide income documentation as specified in subparagraph (iii) of this paragraph." *Id.*

Subdivision (4) of Section 2511, effective in 2016, 2017 and 2018, provided, in pertinent part, that "[a]ny individual who, with the intent to obtain benefits, willfully misstates income or residence to establish eligibility pursuant to subdivision two of this section . . . shall repay such subsidy to the commissioner. . . ." N.Y. Pub. Health L. § 2511(4).

plaintiff's counsel or filed with the Court by March 29, 2019. On December 18, 2018, Flores filed a Consent to Joinder to become a party plaintiff in this action; and on January 3, 2019, Ramirez filed a Consent to Joinder to become a party plaintiff in this action.

Plaintiffs now move, following the close of discovery, for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure (i) declaring that Jennifer Ayala and Beckerman are individually liable as "employers" under the FLSA; (ii) on Alvarado's retaliation claim under Section 215 of the NYLL; and (iii) on their claims for failure to issue wage statements and wage notices in violation of Section 195 of the NYLL. Defendants cross-move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing plaintiffs' FLSA and NYLL claims for unpaid overtime wages and plaintiffs' claims against Anthony Ayala in their entirety.

III.    Discussion[13]

A.    Standard of Review

"Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *ING Bank N.V. v. M/V TEMARA, IMO No. 9333929*, 892 F.3d 511, 518 (2d Cir. 2018) (quoting Fed. R. Civ. P. 56(a)); *accord Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018). In ruling on a summary judgment motion, the district court must first "determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007); *see also Ricci v. DeStefano*, 557 U.S. 557, 129 S. Ct. 2658, 2677, 174 L. Ed.

---

[13] Unless otherwise noted, case quotations omit all internal quotation marks, citations, footnotes, and alterations.

2d 490 (2009) ("On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts." (emphasis added)). "A fact is material if it 'might affect the outcome of the suit under the governing law[.]'" *Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 25 (2d Cir. 2015) (quoting *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505).

In reviewing the record to determine whether there is a genuine issue for trial, the court must "construe the evidence in the light most favorable to the non-moving party," *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017), and "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 45 (2d Cir. 2019); *see also Hancock v. County of Rensselaer*, 882 F.3d 58, 64 (2d Cir. 2018) ("In determining whether there is a genuine dispute as to a material fact, we must resolve all ambiguities and draw all inferences against the moving party.") "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Pollard v. New York Methodist Hosp.*, 861 F.3d 374, 378 (2d Cir. 2017) (quoting *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505); *accord Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113-14 (2d Cir. 2017). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci*, 557 U.S. at 586, 129 S. Ct. at 2677 (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)); *accord Baez v. JetBlue Airways Corp.*, 793 F.3d 269, 274 (2d Cir. 2015).

"The moving party bears the initial burden of showing that there is no genuine dispute as to a material fact." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013); *accord Jaffer*, 887 F.3d at 114. "[W]hen the moving party has carried its burden[,] . . . its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . [,]" *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (quoting *Matsushita Elec.*, 475 U.S. at 586-87, 106 S. Ct. 1348), and must offer "some hard evidence showing that its version of the events is not wholly fanciful[.]" *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008). The nonmoving party can only defeat summary judgment "by adduc[ing] evidence on which the jury could reasonably find for that party." *Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 56 (2d Cir. 2012). "'The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient' to defeat a summary judgment motion[,]" *Fabrikant v. French*, 691 F.3d 193, 205 (2d Cir. 2012) (quoting *Anderson*, 477 U.S. at 252, 106 S. Ct. 2505); and "[a] court cannot credit a plaintiff's merely speculative or conclusory assertions." *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012); *see also Federal Trade Comm'n v. Moses*, 913 F.3d 297, 305 (2d Cir. 2019) ("[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."); *Flores v. United States*, 885 F.3d 119, 122 (2d Cir. 2018) ("While we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the non-moving party, . . . conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment"). Since "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party[,] . . . [i]f the

51

evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." *Anderson*, 477 U.S. at 249-50, 106 S. Ct. 2505.

Summary judgment is warranted, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *accord El-Nahal v. Yassky*, 835 F.3d 248, 252 (2d Cir. 2016); *see also Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014) ("[W]here the nonmoving party will bear the burden of proof on an issue at trial, the moving party may satisfy its burden [of showing the absence of a genuine dispute as to any material fact] by pointing to an absence of evidence to support an essential element of the nonmoving party's case"). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23, 106 S. Ct. 2548; *accord Crawford*, 758 F.3d at 486; *see also Chandok v. Klessig*, 632 F.3d 803, 812 (2d Cir. 2011) ("Where the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements become immaterial and cannot defeat a motion for summary judgment.") "The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323, 106 S. Ct. 2548. Accordingly, when "the burden of persuasion at trial would be on the non-moving party . . . the party moving for summary judgment may satisfy his burden of production under Rule 56 in

either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." *Nick's Garage*, 875 F.3d at 114; *see also DeRogatis v. Bd. of Trs. of Welfare Fund of Int'l Union of Operating Eng'rs Local 15, 15A, 15C & 15D, AFLCIO ("In re DeRogatis")*, 904 F.3d 174, 187 (2d Cir. 2018) (holding that when the ultimate burden of proof at trial would be on the non-moving party, the moving party "may satisfy their burden of production under Rule 56 by negating an essential element of the [non-moving party's] claim, whether by submitting undisputed evidence to that effect or by demonstrating the insufficiency of the [non-moving party's] own evidence.")

Where multiple parties move for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001); *see also Coutard v. Municipal Credit Union*, 848 F.3d 102, 114 (2d Cir. 2017) ("The fact that both sides have moved for summary judgment does not guarantee that there is no material issue of fact to be tried and that one side or the other is entitled to that relief. . . . In considering such motions and determining whether there is a genuine issue of fact to be tried, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.")

B.    Plaintiffs' Motion

1.    Individual Liability

Initially, since defendants do not specifically oppose, or otherwise address, so much of

plaintiffs' motion as seeks summary judgment declaring that Beckerman is an "employer" within the meaning of the FLSA, they seemingly abandoned any defense to that claim. *See Jackson v. Federal Express*, 766 F.3d 189, 198 (2d Cir. 2014) (holding that in cases where a counseled party makes only a partial response to a motion for summary judgment, referencing some claims or defenses but not others, "a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned."); *e.g. Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016) ("[P]leadings often are designed to include all possible claims or defenses, and parties are always free to abandon some of them. And insofar as summary judgment is known as a highly useful method of narrowing the issues for trial, it follows that preparation of a response to a motion for summary judgment is a particularly appropriate time for a non-movant party to decide whether to pursue or abandon some claims or defenses. Accordingly, generally . . . a partial response reflects a decision by a party's attorney to pursue some claims or defenses and to abandon others, and a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned.") In any event, the record clearly establishes that Beckerman was an "employer" for purposes of the FLSA and, thus, the branch of plaintiffs' motion seeking a determination that Beckerman is individually liable under the FLSA is granted.

An individual may be held liable under the FLSA only if she is an "employer," *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999), which the statute broadly defines to "include[] any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). Since "broad coverage under the FLSA is essential to accomplish the statute's goal of outlawing from interstate commerce goods produced under

conditions that fall below minimum standards of decency[,] . . . the [Supreme] Court has consistently construed the Act liberally to apply to the furthest reaches consistent with congressional direction." *Irizarry v. Catsimatidis*, 722 F.3d 99, 103 (2d Cir. 2013). "Even in the individual-liability context, . . . the remedial nature of the FLSA [] warrants an expansive interpretation of its provisions so that they will have the widest possible impact in the national economy." *Id.* at 110; *accord Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 113-14 (2d Cir. 2015).

"[T]he determination of whether an employer-employee relationship exists for purposes of the FLSA should be grounded in economic reality rather than technical concepts," *Irizarry*, 722 F.3d at 104, "determined by reference not to isolated factors, but rather upon the circumstances of the whole activity." *Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 141 (2d Cir. 2008). "The "economic reality" test applies equally to whether workers are employees and to whether managers or owners are employers." *Irizarry*, 722 F.3d at 104. "The Second Circuit has treated employment for FLSA purposes as a flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances." *Id.*; *see also Velarde v. GW GJ, Inc.*, 914 F.3d 779, 783 (2d Cir. 2019) ("[T]he concept of 'employment'-- pivotal to FLSA's application-- is a flexible one to be determined on a case-by-case basis by review of the totality of the circumstances while emphasizing the 'economic reality' of the parties' relationships.")

"The underlying inquiry in determining 'employer' status is whether the individual possessed operational control over employees: control over a company's actual 'operations' in a manner that relates to a plaintiff's employment." *Tapia v. Blch 3rd Ave LLC*, 906 F.3d 58, 61 (2d Cir. 2018); *see also Irizarry*, 722 F.3d at 109 (holding that the focus is on the individual

defendant's operational control of the company's employment of the plaintiffs, "rather than simply operational control of the company.") "A person exercises operational control over employees if his or her role within the company, and the decisions it entails, directly affect the nature or conditions of the employees' employment." *Irizarry*, 722 F.3d at 110; *accord Tapia*, 906 F.3d at 61. Although the individual "employer" need not be responsible for managing plaintiff employees, or have even directly come into contact with the plaintiffs, their workplaces, or their schedules, "the relationship between the individual's operational function and the plaintiffs' employment must be closer in degree than simple but-for causation." *Irizarry*, 722 F.3d at 110. Moreover, "'operational control' need not be exercised constantly for an individual to be liable under the FLSA." *Id.*

"Evidence that an individual is an owner or officer of a company, or otherwise makes corporate decisions that have nothing to do with an employee's function, is insufficient to demonstrate 'employer' status." *Irizarry*, 722 F.3d at 109; *accord Morales v. Rochdale Vill. Inc.*, No. 15 CV 502, 2015 WL 6442590, at * 4 (E.D.N.Y. Oct. 23, 2015). "Ownership, or a stake in a company, is insufficient to establish that an individual is an 'employer' without some involvement in the company's employment of the employees." *Irizarry*, 722 F.3d at 111; *accord Bravo v. Shamailov*, 221 F. Supp. 3d 413, 422 (S.D.N.Y. 2016). "Instead, to be an 'employer,' an individual defendant must possess control over a company's actual 'operations' in a manner that relates to a plaintiff's employment." *Irizarry*, 722 F.3d at 109; *see also Park v. Sancia Healthcare Inc.*, No. 17-cv-00720, 2020 WL 3440096, at *4 (S.D.N.Y. June 23, 2020) ("A corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation for FLSA liability purposes. . . . However, alleging that an individual

exercised mere 'operational control' over a corporation is not enough to establish FLSA liability. Rather, most circuits [] have acknowledged [] that a company owner, president, or stockholder must have at least some degree of involvement in the way the company interacts with employees to be a FLSA 'employer.' . . . Stated another way, a plaintiff must allege that the corporate officer exercised operational control over employment decisions specifically rather than exercise[d] operational control over an organization generally.") "[S]ome degree of individual involvement in a company in a manner that affects employment-related factors such as workplace conditions and operations, personnel, or compensation" is required. *Irizarry*, 722 F.3d at 109.

The FLSA does not "require[] an individual to have been personally complicit in FLSA violations; the broad remedial purposes behind the statute counsel against such a requirement." *Irizarry*, 722 F.3d at 110. "Nor is only evidence indicating an individual's direct control over the plaintiff employees to be considered." *Id.*; *see also Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 69 (2d Cir. 2003) ("[T]he broad language of the FLSA, as interpreted by the Supreme Court . . . demands that a district court look beyond an entity's formal right to control the physical performance of another's work before declaring that the entity is not an employer under the FLSA.") "Instead, evidence showing an individual's authority over management, supervision, and oversight of a company's affairs in general is relevant to the totality of the circumstances in determining the individual's operational control of the company's employment of the plaintiff employees." *Irizarry*, 722 F.3d at 110; *see also Herman*, 172 F.3d at 140 (holding that operational control is relevant in determining whether an individual is an employer under the FLSA).

Courts should consider four (4) nonexclusive factors "to determine the 'economic reality' of an employment relationship: whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Irizarry*, 722 F.3d at 104-06. However, "[n]one of the factors . . . comprise a rigid rule for the identification of an FLSA employer. . . . To the contrary, [] they provide a nonexclusive and overlapping set of factors to ensure that the economic realities test mandated by the Supreme Court is sufficiently comprehensive and flexible to give proper effect to the broad language of the FLSA." *Id.* at 105; *see also Tapia*, 906 F.3d at 61 ("No one of the four factors standing alone is dispositive."); *Barfield*, 537 F.3d at 143 ("[W]hile satisfaction of the four factors . . . can be *sufficient* to establish employment status, we had never held that a positive finding on those four factors is *necessary* to establish an employment relationship." (emphasis in original)). As set forth above, other factors courts should consider in considering whether an individual official is liable as an employer include: (a) "the scope of the individual's 'operational control' over employment-related factors such as workplace conditions and operations, personnel, or compensation[,] . . . [including] the extent to which the individual (1) exercised financial control over the company, and (2) gave instructions to subordinate managers on matters concerning employment practices[;] . . . [and (b)] the individual's 'potential power,' *i.e.*, the extent to which he has authority to control employees, even if he does not exercise it." *Vasto v. Credico (USA) LLC*, No. 15 Civ. 9298, 2016 WL 4147241, at *4 (S.D.N.Y. Aug. 3, 2016).

"[T]he inquiry as to whether an entity is an employer for purposes of the FLSA involves three types of determinations. First, there are historical findings of fact that underlie each of the

relevant factors. Second, there are findings as to the existence and degree of each factor. Finally, there is the conclusion of law to be drawn from applying the factors, *i.e.*, whether an entity is a joint employer." *Zheng*, 355 F.3d at 76. "The first two determinations-- the findings of historical fact and the findings as to the existence and degree of each factor-- are findings of fact. *Id.*; *accord Tapia*, 906 F.3d at 61. "Only the last determination-- the ultimate decision as to whether a party is an employer-- is a legal conclusion." *Zheng*, 355 F.3d at 76. "In order to grant summary judgment for [plaintiffs], the District Court would have to conclude that, even where both the historical facts and the relevant factors are interpreted in the light most favorable to [defendants], [plaintiffs] are still entitled to judgment as a matter of law." *Id.* Since "[t]he question of whether a defendant is an employer under the FLSA is a mixed question of law and fact, with the existence and degree of each relevant factor lending itself to factual determinations[,] . . . individual employer liability is rarely suitable for summary judgment." *Berrios v. Nicholas Zito Racing Stable, Inc.*, 849 F. Supp. 2d 372, 393 (E.D.N.Y. 2012); *see also Franco v. Ideal Mortg. Bankers, Ltd.*, No. 07-cv-3956, 2011 WL 317971, at *6 (E.D.N.Y. Jan. 28, 2011) (holding that mixed questions of law and fact, such as the question of whether an individual defendant is an FLSA "employer," "are especially well-suited for jury determination . . . [and] rarely suitable for summary judgment.")

Plaintiffs have not satisfied their burden of showing that there are no genuine disputes of material fact regarding the extent and degree to which Jennifer Ayala exercised operational control of GC's employment of plaintiffs, rendering summary judgment on the issue of whether she is individually liable as an employer under the FLSA inappropriate. There is no question that GC was the plaintiffs' employer and that Jennifer Ayala, as Chief Executive Officer and sole

owner of GC, had functional control over the enterprise as a whole and represented herself on GC's tax returns as being the President of the company. Moreover, there is evidence indicating that Jennifer Ayala hired managerial staff, specifically Beckerman, who ran the day-to-day activities of GC and directly supervised plaintiffs, which is "a strong indication of control." *Irizarry*, 722 F.3d at 106, 114; *see also Berrios*, 849 F. Supp. 2d at 393 ("The fact that Zito delegated to his assistants the responsibility of hiring and firing lower level employees did not in any way relinquish his authority to hire or fire those employees.") There is also evidence that Jennifer Ayala had overall financial control of GC, *e.g.*, she exercised and possessed financial control over GC's bank accounts, signed payroll and business checks, paid Beckerman his salary, and had the ultimate authority to dissolve the company at any time.

However, the record is bereft of evidence indicating that Jennifer Ayala supervised or controlled work schedules or other personnel decisions, was personally aware of plaintiffs' hours or other conditions of employment, determined plaintiffs' rates and methods of payment, or was actively involved in maintaining employment records[14]. Instead, the record demonstrates that Beckerman was the individual who managed GC's overall daily operations and that he, not Jennifer Ayala, was the individual that made decisions regarding the hiring, termination, pay rates, work assignments and schedules of employees.

Nonetheless, although Beckerman was responsible for making wage payment determinations, it would certainly be reasonable for a jury to conclude that Jennifer Ayala, as CEO and owner of GC, had some influence over those decisions. *See, e.g. Berrios*, 849 F. Supp.

---

[14] The fact that Jennifer Ayala may have stored those payroll records in the basement of her home is, without more, insufficient to establish that she was actively involved in maintaining those records. The record indicates that Jennifer Ayala is not familiar with the employment records.

2d at 393. Moreover, although it was Beckerman who paid plaintiffs in cash each week, Jennifer Ayala provided him with the cash to do so[15].

In addition, although there is evidence indicating that Jennifer Ayala may have given Beckerman instructions with respect to negotiating certain business dealings, the record is bereft of any evidence indicating that she ever gave Beckerman instructions on matters relating to employment practices. *Cf. Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 339, 353 (E.D.N.Y. 2015) (finding that a principal of a company "controlled employee work schedules or conditions of employment" where, *inter alia*, he set the company's policy of not allowing employees to work more than forty hours a week and instructed an employee to issue a Form 1099 to an employee who he learned had worked more than forty hours a week). Accordingly, plaintiffs have not established as a matter of law that Jennifer Ayala had "operational control" of GC's employment of plaintiffs, as opposed to simply operational control of the company, *i.e.*, that she exercised sufficient management, supervision and oversight of GC's employment practices so as to qualify as an "employer" within the meaning of the FLSA. Therefore, the branch of plaintiffs' motion seeking summary judgment finding that Jennifer Ayala is jointly and individually liable as an FLSA "employer" is denied.

2.      Alvarado's New York Labor Law § 215(1) Retaliation Claim

Alvarado claims that defendants violated Section 215(1) of the NYLL by sending him the

---

[15] The evidence indicates that on those occasions when employees were paid by check, Beckerman would tell Jennifer Ayala the name of the payee and the amount of the payment and she would then sign the check. "[A]lthough the authority to sign paychecks is key to determining whether an individual is an employer, this—like all factors—is not dispositive." *Salinas v. Starjem Rest. Corp.*, 123 F. Supp. 3d 442, 464 (S.D.N.Y. 2015); *see also Irizarry*, 722 F.3d at 115 (holding that the fact that an individual plaintiff's electronic signature appeared on paychecks was not dispositive).

May 5, 2018 Letter purportedly threatening criminal charges in retaliation for his complaints about their alleged violations of Article 9 of the NYLL. Section 215(1) of the NYLL provides, in pertinent part: "No employer . . . shall discharge, threaten, penalize, or in any other manner discriminate or retaliate against any employee (i) because such employee has made a complaint to his or her employer, or to the commissioner or his or her authorized representative, or to the attorney general or any other person, that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of this chapter, or any order issued by the commissioner (ii) because such employer or person believes that such employee has made a complaint to his or her employer, or to the commissioner or his or her authorized representative, or to the attorney general, or to any other person that the employer has violated any provision of this chapter, or any order issued by the commissioner (iii) because such employee has caused to be instituted or is about to institute a proceeding under or related to this chapter, or (iv) because such employee has provided information to the commissioner or his or her authorized representative or the attorney general, or (v) because such employee has testified or is about to testify in an investigation or proceeding under this chapter, or (vi) because such employee has otherwise exercised rights protected under this chapter, or (vii) because the employer has received an adverse determination from the commissioner involving the employee." N.Y. Labor Law § 215(1).

Section 215 "explicitly reaches threats as well as fully executed retaliatory actions." *Khurana v. Wahed Invest, LLC ("Khurana II")*, No. 18-cv-233, 2020 WL 364794, at *14 (S.D.N.Y. Jan. 8, 2020), *report and recommendation adopted*, 2020 WL 364022 (S.D.N.Y. Jan. 22, 2020). Moreover, "most cases have found that Section 215 applies to current and former

employers." *Romero v. Bestcare, Inc.*, No. CV 15-7397, 2018 WL 1702001, at *4 (E.D.N.Y.

Feb. 28, 2018) (citing cases), *report and recommendation adopted*, 2018 WL 1701948 (E.D.N.Y.

Mar. 31, 2018); *see also Shetty v. SG Blocks, Inc.*, No. 20-cv-00550, 2020 WL 3183779, at *9

(E.D.N.Y. June 15, 2020) ("Employer actions after termination may, in some instances,

constitute retaliatory action."); *Wigdor v. SoulCycle, LLC*, 139 A.D.3d 613, 33 N.Y.S.3d 30

(N.Y. App. Div. 2016) ("Labor Law § 215(1)(a), which prohibits an 'employer' from retaliating

against an 'employee' for engaging in protected activities, was clearly intended to provide

employees with a cause of action against their current and former employers."); *Oram v.

SoulCycle LLC*, 979 F. Supp. 2d 498, 509 (S.D.N.Y. 2013) ("[F]ormer employees have been

recognized as covered by NYLL § 215.")

       To establish a *prima facie* claim of retaliation under Section 215(1) of the NYLL, "a

plaintiff must show [] participation in protected activity [] and a causal connection between the

protected activity and the adverse employment action." *Thompson v. Jennings & Hartwell Fuel

Oil Corp.*, No. 14 CV 1857, 2015 WL 5437492, at *4 (E.D.N.Y. Aug. 27, 2015), *report and

recommendation adopted*, 2015 WL 5444939 (E.D.N.Y.  Sept. 15, 2015); *accord Farmer v.

Patino*, No. 18-cv-1435, 2020 WL 5342592, at * 5 (E.D.N.Y. Sept. 4, 2020); *Kassman v. KPMG

LLP*, 925 F. Supp. 2d 453, 472 (S.D.N.Y. 2013). "Once the plaintiff establishes a *prima facie*

case of retaliation under Section 215, the burden shifts to the defendant to produce evidence

suggesting that it had a legitimate, non-retaliatory explanation for its actions. . . . The plaintiff

must then persuade the finder of fact that the proffered explanation is pretextual." *Esmilla v.

Cosmopolitan Club*, 936 F. Supp. 2d 229, 239 (S.D.N.Y. 2013); *accord Benzinger v. Lukoil Pan

Americas, LLC*, 447 F. Supp. 3d 99, 130 (S.D.N.Y. 2020); *Copantitla v. Fiskardo Estiatorio,*

*Inc.*, 788 F. Supp. 2d 253, 302 (S.D.N.Y. 2011).

There is no dispute that by sending the Demand Letter seeking to resolve his overtime claim, Alvarado qualified for the protection of Section 215. Thus, the issue is whether defendants' May 5, 2018 Letter constitutes an "adverse employment action," *i.e.*, "an employment action disadvantaging the plaintiff." *Khurana II*, 2020 WL 364794, at *14; *see also Guallpa v. N.Y. Pro Signs Inc.*, No. 11 Civ. 3133, 2014 WL 2200393, at * 8 (S.D.N.Y. May 27, 2014), *report and recommendation adopted*, 2014 WL 4105948 (S.D.N.Y. Aug. 18, 2014). "Generally speaking, the test is met if the conduct complained of might have dissuaded a reasonable worker from making or supporting similar charges." *Khurana II*, 2020 WL 364794, at * 14; *accord Romero*, 2018 WL 1702001, at * 5; *Oram*, 979 F. Supp. 2d at 510. "Courts have routinely held that this definition encompasses a broad range of retaliatory acts, including those not traditionally implicated in an employer-employee relationship." *Oram*, 979 F. Supp. 2d at 510.

In making the determination of whether the challenged conduct constitutes an adverse employment action, "context matters." *Khurana II*, 2020 WL 364794, at *14; *see also Aponte v. Modern Furniture Mfg. Co., LLC*, No. 14-cv-4813, 2016 WL 5372799, at *15 (E.D.N.Y. Sept. 26, 2016). "In the context of a claim for post-employment retaliation, a relatively narrow range of conduct has been recognized in this Circuit as potential unlawful retaliation." *Khurana II*, 2020 WL 364794, at *14; *see also Porter v. MooreGroup Corp.*, No. 17-cv-07405, 2020 WL 32434, at * 11 (E.D.N.Y. Jan. 2, 2020) ("Retaliation claims made by former employees for post-employment conduct are . . . allowed under 'relatively narrow' circumstances."); *Jian Zhong Li v. Oliver Kings Enters., Inc.*, No. 14-cv-9293, 2015 WL 4643145, at * 3 (S.D.N.Y. Aug. 4, 2015)

("The scope of post-employment conduct that does not have a direct connection to the former employee's employment prospects that has been recognized in this Circuit as potential unlawful retaliation under FLSA is . . . relatively narrow.") "[T]hat narrow range includes instituting bad faith or groundless counterclaims or other bad faith litigation against the former employee." *Khurana II*, 2020 WL 364794, at *14; *see also Porter*, 2020 WL 32434, at * 11 ("[C]ourts in the Second Circuit have recognized actionable retaliation claims in situations involving either employment-related harm or a threatened legal claim, including threatening immigration-related consequences and instituting bad faith litigation against the employee."); *Romero*, 2018 WL 1702001, at * 5 ("[C]ourts have held that baseless claims or lawsuits designed to deter claimants from seeking legal redress constitute impermissibly adverse retaliatory actions, even though they do not arise strictly in an employment context." (citing cases)); *Jian Zhong Li*, 2015 WL 4643145, at * 3 ("Courts have held that instituting bad faith or groundless counterclaims or instituting bad faith litigation against the employee constitutes actionable retaliation."); *Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, 472-73 (S.D.N.Y. 2008) ("Courts have held that baseless claims or lawsuits designed to deter claimants from seeking legal redress constitute impermissibly adverse retaliatory actions, even though they do not arise strictly in an employment context."); *Centeno-Bernuy v. Perry*, 302 F. Supp. 2d 128, 136 (W.D.N.Y. 2003) (finding that the employer's actions after learning of the lawsuit, *i.e.*, "reporting plaintiffs to the INS and making baseless allegations to the government that plaintiffs are terrorists, constitute an adverse employment action.") "Bad faith or groundless counterclaims and other legal proceedings against employees who assert statutory rights are actionable retaliation precisely because of their *in terrorem* effect." *Torres*, 628 F. Supp. 2d at 473; *accord Jian Zhong Li*, 2015

WL 4643145, at * 3. However, the interposition of valid claims or lawsuits "would not dissuade a reasonable worker from suing his or her employer for violating the Labor Law." *Arevalo v. Burg*, 129 A.D.3d 417, 10 N.Y.S.3d 231 (N.Y. App. Div. 2015); *Cf. Bill Johnson's Rests., Inc. v. N.L.R.B.*, 461 U.S. 731, 743, 103 S. Ct. 2161, 76 L. Ed. 2d 277 (1983) ("The filing and prosecution of a well-founded lawsuit may not be enjoined as an unfair labor practice, even if it would not have been commenced but for the plaintiff's desire to retaliate against the defendant for exercising rights protected by the [National Labor Relations] Act. Although it is not unlawful under the Act to prosecute a meritorious action, the same is not true of suits based on insubstantial claims—suits that lack . . . a 'reasonable basis.'")

Construing the evidence in the light most favorable to defendants, genuine disputes of material fact exist regarding, *inter alia*, whether defendants' May 5, 2018 Letter was retaliatory, *i.e.*, whether it constitutes a threat to file baseless criminal charges or other bad faith litigation against Alvarado if he proceeded with his claims for the purpose of dissuading Alvarado from pursing those claims[16], and whether defendants' proffered explanation therefor is pretextual. *See, e.g. Khurana v. Wahed Invest, LLC ("Khurana I")*, No. 18-cv-233, 2019 WL 1430433, at * 16 (S.D.N.Y. Feb. 26, 2019), *report and recommendation adopted*, 2019 WL 1432589 (S.D.N.Y. Mar. 29, 2019) ("[A]lthough the snippet provided [of two sentences from an attorney's email] *could* be read to suggest that criminal complaints had been (or would be) filed against plaintiff,

---

[16] Although "reporting or threatening to report an undocumented immigrant to immigration authorities constitutes a retaliatory employment action," *Guohua Liu v. Elegance Rest. Furniture Corp.*, No. 15-cv-5787, 2017 WL 4339476, at *5 (E.D.N.Y. Sept. 25, 2017); *accord Santos v. E T & K Foods, Inc.*, No. 2017 WL 9256490, at * 3 (E.D.N.Y. June 27, 2017), there is no explicit reference to Alvarado's deportation or immigration status in the May 5, 2018 Letter, nor any indication in the record from which a rational finder of fact could reasonably infer that defendants ever believed that Alvarado was an undocumented immigrant or otherwise subject to deportation. To the contrary, Beckerman asserts, in relevant part, that, to the best of his knowledge, Alvarado resides in the United States legally; that Alvarado provided a social security number during his employment with GC; and that Beckerman was not aware of any crime being committed by Alvarado with respect to his immigration status. (Beckerman Decl., ¶ 2).

the language is also susceptible of an alternate reading: that there is a risk of criminal liability for defendants [*sic*] (or others) should this civil action proceed. . . . Nor has plaintiff alleged that the potential criminal claims (if asserted against him) would be 'groundless' or brought in 'bad faith.'") The cases cited by plaintiffs are distinguishable insofar as, *inter alia*, they asserted an adverse employment action based upon the filing, or potential filing, of criminal allegations or claims that were completely baseless, *i.e.*, without any basis in fact or law. *See, e.g. Darveau v. Detecon, Inc.*, 515 F.3d 334, 343 (4th Cir. 2008) (employer's action for fraud was "without a reasonable basis in fact or law"); *Centeno-Berney*, 302 F. Supp. 2d at 136 (employer made "baseless" allegations to the government that the plaintiffs were terrorists); *cf. Khurana I*, 2019 WL 1430433, at * 16 (finding that the plaintiff failed to allege a plausible adverse employment action because, *inter alia*, the complaint did not say anything "about the merits of the potential criminal claims, much less allege facts which, accepted as true, would demonstrate that defendants' 'threat of criminal prosecution,' . . . was baseless.") To the contrary, defendants have submitted some evidence, *e.g.*, Beckerman's testimony, from which a rational finder of fact could reasonably infer that defendants believed there was a risk of criminal or civil liability to Alvarado should this civil action proceed.[17] Accordingly, the branch of plaintiffs' motion seeking summary judgment on Alvarado's retaliation claim under Section 215(1) of the NYLL is

---

[17] Whether or not Alvarado actually committed fraud does not change this result; nor does the fact that eligibility for CHP is determined by gross, as opposed to hourly, income. Such factors merely go to the credibility of defendants' proffered explanation, which is not properly determined on a motion for summary judgment. *See Green v. Town of E. Haven*, 952 F.3d 394, 406 (2d Cir. 2020) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge [] ruling on a motion for summary judgment.") If a jury credits Beckerman's testimony regarding Alvarado's request to report his income a certain way on the paystubs so that he would continue to qualify for benefits, it could reasonably find that defendants' belief that Alvarado committed fraud was legitimate. *See, e.g. Hayes v. Dahlke*, 976 F.3d 259, 276 (2d Cir. 2020) ("[T]he ultimate resolution of who is telling the truth . . . must be made by a jury, since there are clearly disputed issues of fact and credibility determinations that cannot be made by a court on a motion for summary judgment.")

denied.

        3.      New York Labor Law §§ 195(1) and 195(3) Claims

The New York Labor Law requires, in pertinent part, that "[e]very employer shall:

> 1. (a) . . . provide his or her employees, in writing in English and in the language identified by each employee as the primary language of such employee, at the time of hiring, a notice containing the following information: the rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances; prevailing wage supplements, if any, claimed as part of any prevailing wage or similar requirement pursuant to article eight of this chapter; the regular pay day designated by the employer in accordance with section one hundred ninety-one of this article; the name of the employer; any 'doing business as' names used by the employer; the physical address of the employer's main office or principal place of business, and a mailing address if different; the telephone number of the employer; plus such other information as the commissioner deems material and necessary. . . . Each time the employer provides such notice to an employee, the employer shall obtain from the employee a signed and dated written acknowledgement, in English and in the primary language of the employee, of receipt of this notice, which the employer shall preserve and maintain for six years. Such acknowledgement shall include an affirmation by the employee that the employee accurately identified his or her primary language to the employer, and that the notice provided by the employer to such employee pursuant to this subdivision was in the language so identified or otherwise complied with paragraph (c) of this subdivision, and shall conform to any additional requirements established by the commissioner with regard to content and form. For all employees who are not exempt from overtime compensation as established in the commissioner's minimum wage orders or otherwise provided by New York state law or regulation, the notice must state the regular hourly rate and overtime rate of pay; [and]
>
> * * *
>
> 3. . . . furnish each employee with a statement with every payment of wages, listing the following: the dates of work covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; deductions; allowances, if any, claimed as part of the minimum wage; prevailing wage supplements, if any, claimed as part of any prevailing wage or similar requirement pursuant to article eight of this chapter; and net wages. . . . For all employees who are not exempt from overtime compensation as established in the commissioner's minimum wage orders or otherwise provided by New York state law or regulation, the statement shall include the regular hourly

> rate or rates of pay; the overtime rate or rates of pay; the number of regular hours worked, and the number of overtime hours worked. . . ."

N.Y. Labor Law § 195.

With respect to the failure to provide a wage notice in accordance with Section 195(1) of the NYLL, the statute provides:

> "If any employee is not provided within ten business days of his or her first day of employment a notice as required by subdivision one of section one hundred ninety-five of this article, he or she may recover in a civil action damages of fifty dollars [$50.00] for each work day that the violations occurred or continue to occur, but not to exceed a total of five thousand dollars [$5,000.00], together with costs and reasonable attorney's fees. . . ."

N.Y. Labor Law § 198(1-b). "There has been a private right of action for employees to recover damages for an employer's failure to provide proper notices since April 9, 2011, when New York's Wage Theft Prevention Act ('WTPA') went into effect." *Ying Dai v. ABNS NY Inc.*, No. 18-cv-05170, 2020 WL 5820130, at *9 (E.D.N.Y. Sept. 29, 2020).

With respect to the failure to provide accurate wage statements in accordance with Section 195(3) of the NYLL, the statute provides:

> "If any employee is not provided a statement or statements as required by subdivision three of section one hundred ninety-five of this article, he or she shall recover in a civil action damages of two hundred fifty dollars [$250.00] for each work day that the violations occurred or continue to occur, but not to exceed a total of five thousand dollars [$5,000.00], together with costs and reasonable attorney's fees. . . ."

N.Y. Labor Law § 198(1-d).

Initially, defendants do not oppose, or otherwise address, so much of plaintiffs' motion as seeks summary judgment (i) on Ramirez's claims seeking the maximum amount of statutory damages for defendants' violations of NYLL §§ 195(1) and (3); or (2) on the other plaintiffs' claims seeking the maximum amount of statutory damages for defendants' failure to provide

them with proper wage statements pursuant to NYLL § 195(3). Accordingly, defendants have seemingly abandoned any defense to those claims. *See Jackson*, 766 F.3d at 198; *Kovaco*, 834 F.3d at 143. Therefore, plaintiffs' motion is granted to the extent that Ramirez is granted summary judgment awarding him statutory damages in the total amount of ten thousand dollars ($10,000.00) for defendants' failure to provide him with a wage notice and wage statements in violation of NYLL §§ 195(1) and (3); and Alvarado, Chagon and Flores are granted summary judgment awarding them each statutory damages in the total amount of five thousand dollars ($5,000.00) for defendants' failure to provide them with proper wage statements in violation of NYLL § 195(3).

Furthermore, whether or not Alvarado's primary language is Spanish does not preclude summary judgment on his NYLL § 195(1) claim. Even assuming, *arguendo*, that Alvarado's primary language is English, as contended by defendants, and, thus, that the wage notice provided to him in English on May 28, 2017 was sufficient in that regard, the record establishes that defendants nonetheless failed to provide him with any wage notice, whether in English or Spanish, either at the time of his hiring, which, according to Beckerman, was in October 2016, or within ten (10) business days of his first day of employment, as required by NYLL § 198(1-b). Accordingly, plaintiffs have established: (i) that Alvarado is entitled to recover statutory damages under NYLL § 195(1) in the amount of "fifty dollars [$50.00] for each work day [*sic*] that the violations occurred;" and (ii) that since Alvarado worked for more than one hundred (100) days during which the violations occurred, he is entitled to the maximum statutory amount of five thousand dollars ($5,000.00) pursuant to NYLL § 198(1-b).

Plaintiffs have also established that neither Chagon or Flores were provided with a wage

notice when they were hired or within ten (10) business days of their first day of employment. Accordingly, plaintiffs have established that Chagon and Flores are entitled to statutory damages on their claims under NYLL § 195(1). However, since neither Chagon nor Flores was employed by defendants for one hundred (100) workdays, they are not entitled to the maximum amount of statutory damages with respect to their claims under NYLL § 195(1). Rather, Chagon and Flores are only entitled to statutory damages in the amount of fifty dollars ($50.00) for each workday that the violations occurred with respect to those claims; but neither of them sufficiently established the number days they worked. Accordingly, the branch of plaintiffs' motion seeking summary judgment on Chagon's and Flores's claims for statutory damages under NYLL § 195(1) is denied with leave to renew upon a showing of the number of days each of them worked during which the violations occurred.

C.      Defendants' Motion

1.      Claims against Anthony Ayala

Plaintiffs do not oppose or otherwise address the branch of defendants' motion seeking summary judgment dismissing their claims against Anthony Ayala in their entirety with prejudice and, thus, have seemingly abandoned those claims. *See Jackson*, 766 F.3d at 198; *e.g. Camarda v. Selover*, 673 F. App'x 26, 30 (2d Cir. Dec. 14, 2016) (summary order) ("Where . . . a counseled non-moving party submits a partial response arguing that summary judgment should be denied as to some claims while not mentioning others, that response may be deemed an abandonment of the unmentioned claims. . . . Even where abandonment by a counseled party is not explicit, a court may infer abandonment from the papers and circumstances viewed as a

71

whole.") In any event, since defendants demonstrated that the evidence is insufficient to establish an essential element of plaintiffs' claims against Anthony Ayala, *i.e.*, that he is an "employer" within the meaning of the FLSA, (*see* Def. 56.1, ¶¶ 10-12, 14-16), the branch of their motion seeking summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing plaintiffs' claims against Anthony Ayala in their entirety is granted and defendants are granted judgment as a matter of law dismissing plaintiffs' claims against Anthony Ayala in their entirety with prejudice.

### 2.    Claims for Unpaid Overtime Wages

Under both the FLSA and NYLL, employers are required, *inter alia*, to pay employees who work over forty (40) hours per week "not less than one and one-half times the regular rate at which [the employees are] employed" for those overtime hours.[18] 29 U.S.C. § 207(a)(1); N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2; *see Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 200 (2d Cir. 2013) ("The FLSA mandates that an employee engaged in interstate commerce be compensated at a rate of no less than one and one-half times the regular rate of pay for any hours worked in excess of forty per week[;] . . . the NYLL adopts this same standard.") A claim for unpaid overtime compensation claim requires a plaintiff to demonstrate: (i) an employee-employer relationship between the plaintiff and the defendant; (ii) that the work involved some kind of interstate activity; and (iii) that the plaintiff worked forty (40) hours of work in a given workweek, "as well as some uncompensated time in excess of the forty hours."

---

[18] "In light of the fact that the relevant portions of New York Labor Law do not diverge from the requirements of the FLSA," the within analysis applies equally to plaintiffs' NYLL claims seeking unpaid overtime wages. *DeJesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 89 (2d Cir. 2013).

*Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 114 (2d Cir. 2013); *accord Fridman v. GCS Computers LLC*, No. 17 Civ. 6698, 2018 WL 1581990, at *2 (S.D.N.Y. Mar. 27, 2018). Only the third element is at issue on defendants' cross motion for summary judgment.

"To establish liability under the FLSA on a claim for unpaid overtime, a plaintiff must prove that he performed work for which he was not properly compensated, and that the employer had actual or constructive knowledge of that work." *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 361 (2d Cir. 2011); *see also Hernandez Gomez v. 4 Runners, Inc.*, 769 F. App'x 1, 2 (2d Cir. Apr. 16, 2019) (summary order) ("To establish damages under the FLSA, plaintiffs must show that they performed work for which they were not properly compensated."); *Hosking v. New World Mortg., Inc.*, 570 F. App'x 28, 31 (2d Cir. June 18, 2014) (summary order) ("An employee suing under the FLSA has the burden of proving that he performed the work for which he was not properly compensated.") When a defendant fails to maintain proper and accurate employment records as required by the FLSA, "an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Reich v. S. New England Telecomm. Corp.*, 121 F.3d 58, 66-67 (2d Cir. 1997); *see also Hernandez Gomez*, 769 F. App'x at 2 ("Absent employer records, employees need only [] produce sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference."); *Gamero v. Koodo Sushi Corp.*, 752 F. App'x 33, 36-37 (2d Cir. Oct. 18, 2018) (summary order) ("Where a plaintiff alleges . . . overtime pay violations, and the employer does not have complete records, . . . the plaintiff bears the burden of proving that he performed work for which he was insufficiently compensated, and of producing sufficient,

credible evidence showing the amount and extent of the uncompensated work as a matter of just and reasonable inference.")

"Thus, at summary judgment, if an employer's records are inaccurate or inadequate, an employee need only present sufficient evidence to show the amount and extent of the uncompensated work as a matter of just and reasonable inference." *Kuebel*, 643 F.3d at 362; *see also Pierre v. Hajar, Inc.*, No. 15-cv-2772, 2018 WL 2393158, at * 3 (E.D.N.Y. Mar. 28, 2018) ("When an employer does not meet these recordkeeping requirements, or otherwise fails to preserve accurate or adequate records, the employee's burden of proof lessens to sufficient evidence to show the amount and extent of the uncompensated work as a matter of just and reasonable inference.") "An employee's burden in this regard is not high. [] It is possible for a plaintiff to meet this burden through estimates based on his own recollection."[19] *Hernandez Gomez*, 769 F. App'x at 2; *accord Kuebel*, 643 F.3d at 362; *see also Vecchio v. Quest Diagnostics Inc.*, No. 16 Civ. 5165, 2020 WL 5604080, at * 7 (S.D.N.Y. Sept. 18, 2020) ("It is the employer's responsibility to keep accurate records of time worked. . . . If the employer does not keep such records, then the plaintiff may prove her hours worked through her own estimations, which at summary judgment, amount to sufficient evidence to show the amount and extent of the uncompensated work as a matter of just and reasonable inference.") "A plaintiff is entitled to establish time worked by his own testimony when a defendant's records are inadequate, and a defendant's records on rebuttal must be sufficient to negative the

---

[19] A similar standard is applicable to overtime claims under New York law. *See Shang Shing Chang v. Wang*, No. 15-cv-4385, 2018 WL 1258801, at * 1 (E.D.N.Y. Mar. 12, 2018).

reasonableness of plaintiff's estimate."[20] *Medina v. Ricardos Mech., Inc.*, No. 16-cv-1407, 2018 WL 3973007, at *5 (E.D.N.Y. Aug. 20, 2018); *see also Rivera v. Harvest Bakery Inc.*, No. 13-cv-00691, 2018 WL 4214337, at *5 (E.D.N.Y. Aug. 17, 2018), *report and recommendation adopted*, 2018 WL 4211301 (E.D.N.Y. Sept. 4, 2018) ("In the absence of sufficient records, an employee may meet his burden by testifying as to his own recollection of the hours worked. . . . Such testimony will presumptively establish the fact of a violation and injury."); *Dudley v. Hanzon Homecare Servs., Inc.*, No. 15-cv-8821, 2018 WL 481884, at *3 (S.D.N.Y. Jan. 17, 2018) (holding that since the defendants did not maintain adequate records of the plaintiff's hours, the plaintiff could carry her burden of showing how many uncompensated hours she worked under the FLSA and the NYLL "based upon her recollection of hours worked, which is presumed to be correct."); *Canela-Rodriguez v. Milbank Real Estate*, No. 09 Civ. 6588, 2010 WL 3701309, at * 2 (S.D.N.Y. Sept. 20, 2010) (holding that an employee may meet his burden of showing the amount and extent of the uncompensated work "as a matter of just and reasonable inference . . . solely through a plaintiff's testimony as to his present memory and recollection.") "In effect, in the absence of employer records, the employee's testimony assumes a rebuttable presumption of accuracy." *Garcia v. Vill. Red Rest. Corp.*, No. 15 Civ. 6292, 2017 WL 3493148, at *1 (S.D.N.Y. Aug. 14, 2017).

Generally, "the dispute as to the precise amount of [a plaintiff's] uncompensated work is one of fact for trial." *Kuebel*, 643 F.3d at 364. "Courts applying *Kuebel* look to whether plaintiffs have raised a just and reasonable inference of the amount of overtime worked in the context of

---

[20] Although "allegations (conclusory or otherwise) cannot defeat summary judgment, *Kuebel* stands for the proposition that a plaintiff's testimony is sufficient, not only to support a 'just and reasonable inference,' . . . but also to raise an issue of fact regarding the accuracy of the employer's records." *Shang Shing Chang*, 2018 WL 1258801, at *2.

their opposition to an employer's summary judgment motion, thereby necessitating a trial." *Murray v. City of New York*, No. 16-cv-8072, 2020 WL 615053, at *10 (S.D.N.Y. Feb. 10, 2020) (citing cases).

There is sufficient evidence in the record from which a rational finder of fact could conclude, "as a matter of just and reasonable inference," that each of the plaintiffs performed some amount of uncompensated work that is potentially recoverable as damages. *See, e.g. Kuebel*, 643 F.3d at 364 (finding that the plaintiff satisfied his burden, as the non-moving party, of presenting sufficient evidence to show the amount and extent of uncompensated overtime work "as a matter of just and reasonable inference," through his own estimate that he worked one to five hours of overtime each week); *Perry v. City of New York*, No. 13-cv-1015, 2018 WL 1474401, at *5 (S.D.N.Y. Mar. 26, 2018) ("[T[o survive summary judgment, [plaintiffs] need only show that *some* amount of uncompensated work was performed." (emphasis in original)). The record evidence is also sufficient to raise a genuine dispute of material fact regarding, *inter alia*, the accuracy of defendants' employment records, the hours each of the plaintiffs worked, the actual manner of their pay and whether their salary included overtime pay. Accordingly, the branch of defendants' cross motion seeking summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing plaintiffs' FLSA ad NYLL claims for unpaid overtime compensation is denied.

IV.    Conclusion

For the reasons set forth above, (i) the branches of plaintiffs' motion seeking summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure (A) declaring that

Beckerman is individually liable as an "employer" under the FLSA, (B) on Alvarado's and Ramirez's claims seeking the maximum amount of statutory damages for defendants' violations of NYLL §§ 195(1) and (3), and (C) on Chagon's and Flores's claims seeking the maximum amount of statutory damages for defendants' failure to provide them with proper wage statements pursuant to NYLL § 195(3), are granted and plaintiffs are granted judgment as a matter of law declaring that Beckerman is individually liable as an "employer" under the FLSA, awarding Alvarado and Ramirez statutory damages in the total amount of ten thousand dollars ($10,000.00) each for defendants' failure to provide them with a proper wage notice and wage statements in violation of NYLL §§ 195(1) and (3), and awarding Chagon and Flores statutory damages in the total amount of five thousand dollars ($5,000.00) each for defendants' failure to provide them with proper wage statements in violation of NYLL § 195(3); (ii) the branch of plaintiffs' motion seeking summary judgment on Chagon's and Flores's claims for statutory damages under NYLL § 195(1) is denied with leave to renew upon a showing of the number of days each of them worked during which the violations thereof occurred; (iii) the branch of defendants' cross motion seeking summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing plaintiffs' claims against Anthony Ayala in their entirety is granted, and plaintiffs' claims against Anthony Ayala are dismissed in their entirety with prejudice; and (iv) the parties' cross motions are otherwise denied.

There being no just reason for delay, the Clerk of the Court shall enter judgment in favor of Anthony Ayala pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.

SO ORDERED.

/s/ *Sandra J. Feuerstein*

Sandra J. Feuerstein
United States District Judge

Dated:  January 6, 2021
        Central Islip, New York